**BEFORE THE NATIONAL GRIEVANCE COMMITTEE**
**UNDER THE**
**NATIONAL MASTER FREIGHT AGREEMENT**

ABF FREIGHT SYSTEM, INC.

        Employer,

   against

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, TEAMSTERS NATIONAL
FREIGHT INDUSTRY NEGOTIATING
COMMITTEE, EVERY TEAMSTER LOCAL
UNION THAT IS PARTY TO THE NATIONAL
MASTER FREIGHT AGREEMENT,

        Unions,

   and

YRC INC., NEW PENN MOTOR EXPRESS, INC.
and USF HOLLAND, INC.

        Employers in Violation,

   and

TRUCKING MANAGEMENT, INC.

        Bargaining Representative of
        Employers in Violation.

## GRIEVANCE OF ABF FREIGHT SYSTEM, INC.

For its national grievance, Employer ABF Freight System, Inc. alleges against the International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, every Teamsters Local Union that is party to the National Master Freight Agreement (the "Teamsters Local Unions"), YRC Inc., New Penn Motor Express, Inc., USF Holland, Inc., and Trucking Management Inc., the following:

1.      This grievance involves violations of the National Master Freight Agreement ("NMFA") – a labor contract that has governed unionized freight operations in the United States for almost a half century – on a national scale, insofar as the grievance concerns all of ABF's Teamster-represented employees and all of its operations under the NMFA throughout the country, wherever they are located and wherever its employees may be based.

2.      Grievant ABF Freight System, Inc. (ABF) alleges that in this case the International Brotherhood of Teamsters, in the midst of the most troubled economic times since the Great Depression, granted substantial economic concessions to some, but not all, employers bound by the NMFA in direct contravention of the contract. Accordingly, ABF seeks an order declaring the grant of financial concessions null and void, and granting damages for this fundamental violation of the contract in an amount approximated by ABF to be Seven Hundred Fifty Million Dollars ($750,000,000) for the period of time from the date of the first violation to the expiration date of the NMFA, which is March 31, 2013.

## JURISDICTION

3.      Article 8, Section 1(b), states that "any question concerning the interpretation of the provisions contained in the National Master Freight Agreement shall be submitted to a permanent National Grievance Committee." However, as set forth below, Grievant ABF submits that the members of the National Grievance Committee as presently constituted are incapable of hearing this Grievance by operation of the Committee's own Rules of Procedure. Consequently, ABF is seeking court intervention to give effect to the parties' contract by appointing an alternate neutral tribunal to replace

the National Grievance Committee and/or the National Review Committee to hear and decide this grievance.

**PARTIES**

4.     Grievant ABF is one of the largest unionized trucking companies still doing business in the United States.

5.     For many decades, ABF and The International Brotherhood of Teamsters ("IBT") have been parties to the NMFA.

6.     The NMFA was negotiated on behalf of the IBT and the Teamsters Local Unions by their bargaining agent, the Teamsters National Freight Industry Negotiating Committee ("TNFINC"), the industry-specific bargaining committee of the IBT established for that purpose.

7.     YRC Inc. is an employer party to the NMFA, as were its predecessor companies Yellow Freight System Inc. and Roadway Express Inc.

8.     New Penn Motor Express, Inc. ("New Penn") is an employer party to the NMFA.

9.     USF Holland, Inc. ("Holland") is an employer party to the NMFA.

10.     YRC Inc., USF Holland, Inc. and New Penn Motor Express, Inc. (collectively, the "YRCW Companies") are related companies, in that all of them are subsidiaries of YRC Worldwide Inc.

11.     Trucking Management, Inc. ("TMI") is the authorized collective bargaining agent for its bargaining members, which at the time that the 2008-2013 term of the NMFA was negotiated, included the YRCW Companies and their predecessor companies, but not ABF.

### THE NATIONAL GRIEVANCE COMMITTEE RULES OF PROCEDURE

12.   The National Grievance Committee Rules of Procedure provide at Article II, Paragraph H:

> Neither an Employer nor Union representative may participate as a panelist on the National Grievance Committee to decide cases involving their respective company or local union.

13.   The National Grievance Committee Rules of Procedure further provide at Article V:

> No Union or Employer representative shall serve in any capacity on a Committee or Panel provided for under these Rules in hearing a case in which they were directly involved ... .

14.   The National Grievance Committee Rules of Procedure apply to both the National Grievance Committee and the National Review Committee established by the NMFA.

15.   There are no management members of the National Grievance Committee or the National Review Committee who are not employed by, or who are otherwise acting for, an employer or employer bargaining agent named in this grievance.

16.   There are no union members of the National Grievance Committee or the National Review Committee who are not employed, or who are otherwise acting for, a union or union committee named in this grievance.

17.   By operation of the Rules of Procedure, neither the currently constituted National Grievance Committee, nor the National Review Committee, can properly sit to hear this grievance.

18.   Given the incapacity of any member of either the National Grievance Committee or the National Review Panel to hear this grievance, ABF is seeking court

intervention to appoint an alternate neutral tribunal to replace the National Grievance Committee and/or the National Review Panel to hear and decide this grievance.

<u>**THE COLLECTIVE BARGAINING AGREEMENT AT ISSUE**</u>

19.     ABF, IBT, TNFINC, and the Teamsters Local Unions represented by TNFINC are parties to a written contract entered into on or about January 30, 2008 ("the Interim Agreement"), attached as "Grievance Exhibit A."

20.     According to the terms of the Interim Agreement, the parties agreed to be bound by the terms of an agreement then under negotiation by TMI, which came to be the National Master Freight Agreement, including its Supplemental Freight Agreements, effective April 1, 2008 and expiring on March 31, 2013 (the "2008-2013 NMFA").

21.     The Interim Agreement specifically provided that upon ratification of the 2008-2013 NMFA, ABF would become a party and signatory to the 2008-2013 NMFA, also referred to as the "national standards agreement."

22.     The 2008-2013 NMFA was ratified effective February 10, 2008, to go into effect on April 1, 2008, and by operation of the Interim Agreement, ABF became a party and signatory thereto.

23.     ABF employees represented by Teamsters Local Unions, TNFINC and the IBT were all eligible to participate in the ratification process for the 2008-2013 NMFA, and many of them did participate in the ratification process.

24.     Employees of the YRCW Companies also participated in the ratification process for the 2008-2013 NMFA.

**THE RELEVANT PROVISIONS OF THE 2008-2013 NMFA**

25.     The 2008-2013 NMFA provides in Article 2, Section 4 – Single Bargaining Unit:

> The employees, Unions, Employers and Associations covered under this Master Agreement and the various Supplements thereto shall constitute one (1) bargaining unit and contract. It is understood that the printing of this Master Agreement and the aforesaid Supplements in separate Agreements is for convenience only and is not intended to create separate bargaining units.

26.     The 2008-2013 NMFA provides in Article 31, Multi-Employer, Multi-Union Unit:

> The parties agree to become a part of the multi-employer, multi-union bargaining unit established by this National Master Freight Agreement, and to be bound by the interpretations and enforcement of this National Master Freight Agreement and Supplements thereto.

27.     The 2008-2013 NMFA provides in Article 6, Section 1 - Maintenance of Standards:

> The Employer agrees, subject to the following provisions, that all conditions of employment in his/her individual operation relating to wages, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest standards in effect at the time of the signing of this Agreement, and the conditions of employment shall be improved whenever specific provisions for improvement are made elsewhere in this Agreement.

28.     The 2008-2013 NMFA provides in Article 6, Section 2(a) - Extra Contract Agreements:

> The Employer agrees not to enter into any agreement or contract with its employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

29.     Prior to the NMFA that was in effect for the 2003-2008 term, Article 6 contained additional language that would have allowed pay reduction plans for individual employers under circumstances that qualified under guidelines established by TNFINC.

That language, however, as well as an Appendix A (attached as "Grievance Exhibit B"), was deleted from the NMFA for the 2003-2008 term, and the deletion remained for current NMFA. The deleted language expressly stated that such individual pay reduction plans would not have been a violation of the Extra Contract language. The Extra Contract language quoted in paragraph 28, immediately above, remains in the NMFA, but the language allowing individual relief to individual employers in the form of pay reduction was removed. The former Appendix A has not been part of the NMFA since 2003.

### THE ABF NEGOTIATIONS AND THE INTERIM AGREEMENT

30.     Beginning in 2007, ABF entered into contract negotiations with TNFINC, agent for and designated bargaining representative of the IBT and the Teamsters Local Unions that are members of the IBT and bound by the NMFA, for a successor collective bargaining agreement to the 2003-2008 National Master Freight Agreement (the "2003-2008 NMFA").

31.     By its terms, the 2003-2008 NMFA was to expire on March 31, 2008.

32.     As of 2007, ABF was a signatory to the 2003-2008 NMFA, and at that time, ABF, along with its competitors, Yellow Transportation, Inc. (now merged into YRC Inc.), Roadway Express, Inc. (now YRC Inc.), Holland, and New Penn made up most of the membership of a multi-employer collective bargaining unit represented by TMI as their bargaining agent and spokesperson.

33.     TMI was in 2007 the primary bargaining agent of what remains of the unionized general freight trucking industry.

34. The YRCW Companies are ABF's principal unionized competitors in the freight industry.

35. In August 2007, ABF withdrew authorization from TMI to bargain on its behalf, and notified IBT and TNFINC that ABF would be conducting future negotiations directly with the IBT for "a new collective bargaining agreement applicable only to ABF." The IBT, on behalf of itself, TNFINC and the Teamsters Local Unions acknowledged ABF's withdrawal from the TMI multi-employer bargaining unit and thereafter agreed to, and did, meet separately with ABF representatives to negotiate a collective bargaining agreement.

36. Beginning in October 2007, and continuing through January 2008, the IBT and the Teamsters Local Unions, acting through their authorized agents, including TNFINC, IBT General President and Chairman of TNFINC James P. Hoffa ("Hoffa"), IBT General Secretary Treasurer C. Thomas Keegel ("Keegel"), IBT International Vice President and Co-Chairman of TNFINC Tyson Johnson ("Johnson"), and IBT International Vice President and Assistant National Freight Director Gordon Sweeton ("Sweeton"), engaged in multiple discussions with ABF concerning the potential terms of a collective bargaining agreement. During those meetings the participants discussed, among other topics of mutual concern, potential terms for a collective bargaining agreement that would be separate and apart from the NMFA.

37. Apart from the ABF negotiations, on or about January 9, 2008, TMI concluded its own negotiations with TNFINC for the 2008-2013 NMFA.

38. On or about January 14, 2008, the IBT mailed ballots to all freight industry members, including ABF employees, and employees of YRCW Companies,

encouraging those employees to ratify the "national standards agreement."

39.     On or about January 22, 2008, Johnson informed ABF representatives that the IBT was willing to negotiate a separate agreement applicable only to ABF, but that such an agreement would have to be done by "starting from page one" and would take "a very long time" to complete.  Johnson made clear that such negotiations would not be finalized before the expiration of the parties' then-current collective bargaining agreement, the 2003-2008 NMFA.

40.     Having signaled the IBT, TNFINC, and the Teamsters Local Unions' collective intentions to extend the parties' negotiations beyond the then-current contract term, thereby introducing the potential for a strike upon expiration of the 2003-2008 NMFA, Johnson then pressured ABF representatives to instead agree to the same contract terms as separately negotiated by TMI. More specifically, Tyson suggested ABF sign a "Me Too" agreement to the NMFA for the 2008-2013 term.

41.     In or around the same time, Sweeton sent A.J. Phillips, then ABF's Vice President of Industrial Relations, a copy of  the tentative agreements negotiated between the IBT and TMI for the 2008-2013 NMFA.

42.     On or about January 24, 2008, TNFINC distributed a memo to Teamster-represented ABF employees encouraging them to vote to approve the "Teamsters National Freight Industry Standards Agreement," suggesting that this would "give the Union maximum leverage in its negotiations with ABF."

43.     On or about January 30, 2009, Johnson and other IBT and TNFINC representatives, as agents for IBT and the Teamsters Local Unions,  presented ABF with the Interim Agreement.

44.     By operation of the express terms of the Interim Agreement, ABF was to become a signatory and party to the 2008-2013 NMFA upon its ratification, and the terms of such NMFA were to be a "national standards agreement" for all signatory employees in the freight industry.

45.     Further, in the course of such negotiations, and consistent with the language of the NMFA itself stating that all employers are bound by the same terms, the IBT and its associated Teamsters Local Unions (acting through their authorized agents, including TNFINC and Johnson) represented that the purpose and intent of the Interim Agreement was to bind ABF to the same terms and conditions of employment applicable to all other NMFA employer signatories.

### THE PURPORTED AMENDMENTS TO THE 2008 – 2013 NATIONAL MASTER FREIGHT AGREEMENT

46.     Not long after the execution of the Interim Agreement by ABF and ratification of the 2008-2013 NMFA, TMI negotiated on behalf of the YRCW Companies, what purports to be a formal amendment to the NMFA.

47.     More specifically, in late 2008, the YRCW Companies and TNFINC negotiated an NMFA amendment known as the "Memorandum of Understanding on the Wage Reduction – Job Security Plan" ("NMFA Amendment No. 1") (attached as "Grievance Exhibit C"). In Section 4 of  NMFA Amendment No. 1, the document specifically recites that "[t]his Plan is incorporated by reference into and shall be a part of the 2008-2013 National Master Freight Agreement and its Supplements."

48.     Among other terms, NMFA Amendment No. 1 provided "Wage and mileage rate increases outlined in Article 33 of the NMFA, effective April 1, 2009, April 1, 2010, April 1, 2011, and April 1, 2012 shall also be reduced by 10%," and "The cost of

living adjustment provisions of Article 33 of the NMFA shall be suspended for the duration of the NMFA."

49.     Following the ratification of NMFA Amendment No. 1 in January 2009 (by employees of the YRCW Companies), the YRCW Companies subsequently negotiated with the IBT what purports to be a second amendment of the NMFA known as "The Amended and Restated Memorandum of Understanding on the Job Security Plan" ("NMFA Amendment No. 2") (attached as "Grievance Exhibit D").  Section 5 of NMFA Amendment No. 2 specifically recites that "[t]his Revised Plan is incorporated by reference into and shall be a part of the NMFA."

50.     Among other terms, NMFA Amendment No. 2 specifically provides that "[w]age and mileage rate increases outlined in Article 33 of the NMFA, effective April 1, 2010, April 1, 2011 and April 1, 2012 shall also be reduced by 15%."

51.     The IBT represented employees of the YRCW Companies ratified NMFA Amendment No. 2 on or about August 7, 2009.

52.     Following the ratification of NMFA No. 2, the YRCW Companies subsequently negotiated with the IBT what purports to be a third amendment of the NMFA known as "Agreement for the Restructuring of the YRC Worldwide, Inc. Operating Companies" ("NMFA Amendment No. 3") (attached as "Grievance Exhibit E").  The NMFA Amendment No. 3 was ratified on or about October 29, 2010.  NMFA Amendment No. 3 provides substantial work rule modifications of the NMFA.  Section 8 of NMFA Amendment No. 3 specifically recites that the modifications contained in the amendment "are to be included as part of the first 39 Articles of the NMFA and cover the entire NMFA bargaining unit ... ."

53.     As a consequence of NMFA Amendment No. 1, NMFA Amendment No. 2, and NMFA Amendment No. 3, the NMFA was purported to be amended, with substantial wage and benefit reductions, and work rule modifications, for the employers bound by NMFA.

54.     IBT and TNFINC on behalf of themselves and the Teamsters Local Unions have asserted and continue to assert that NMFA Amendments Nos. 1, 2 and 3 apply only to YRCW Companies, and to no other employer signatory to the 2008-2013 NMFA, including ABF.

### ABF IS ENTITLE TO A DECLARATION SETTING ASIDE PURPORTED NMFA AMENDMENTS AND AWARDING DAMAGES

55.     A consequence of IBT's and TNFINC's assertion that the NMFA Amendments No. 1, No. 2 and No. 3 favor only the YRCW Companies, is that the amendments are asserted to amend the 2008-2013 NMFA to favor some, but not all signatories to the 2008-2013 NMFA, namely, the YRCW Companies.

56.     By purporting to amend the 2008-2013 NMFA in way such that it favored some, but not all signatories to the 2008-2013 NMFA, the IBT violated Article 2, Section 4 ("Single Bargaining Unit"), Article 6, Section 1 ("Maintenance of Standards"), Article 6, Section 2(a) ("Extra Contract Agreements"), Article 31, and other sections of the 2008-2013 NMFA.

57.     Because the adoption of the NMFA Amendments No. 1, No. 2 and No. 3 was in violation of the 2008-2013 NMFA, they should be set aside, by a declaration that to the extent that those amendments apply to the YRCW Companies, and no other employer signatory to the 2008-2013 NMFA, they are in violation of Article 2, Section 4;

Article 6, Sections 1 and 2(a); Article 31 and other provisions of the 2008-2013 NMFA, and are thus null and void.

58.   As a direct result of the application of the NMFA amendments only to YRCW Companies and the refusal to extend to ABF the concessions of those amendments, ABF has paid its employees covered by the NMFA considerably more than the YRCW Companies would  have paid such employees, in amounts estimated by ABF to be approximately Seven Hundred Fifty Million ($750,000,000) for the period from the time of the violation of the agreement through its expiration.

WHEREFORE, Grievant ABF Freight System, Inc. demands the following relief:

1.   An Award declaring that the Amendments Nos. 1, 2 and 3 are a nullity and prohibiting IBT, TNFINC, all Teamster Local Unions bound by the NMFA, the YRCW Companies and TMI from giving effect to those Amendments following entry of the Award.

2.   An Award declaring that there may be no further amendment of the NMFA unless the amendment applies to all employer members of the NMFA bargaining unit.

3.   An award granting Grievant monetary damages in an amount to be proven by Grievant to be caused by the improper Amendments Nos. 1, 2 and 3.

4.   An Award against the IBT, TNFINC, all Teamster Local Unions bound by the NMFA, the YRCW Companies and TMI, requiring them to cease and desist from conspiring to violate and subvert the terms of the NMFA.

5.   An Award providing such other and further relief as ABF may demonstrate to be just and proper.

Dated: Fort Smith, Arkansas
       November 1, 2010

Respectfully submitted,

ABF Freight System, Inc.

By:   *David Evans*
      David Evans
      Vice-President Industrial Relations

# EMPLOYER ABF FREIGHT SYSTEM, INC.

# GRIEVANCE EXHIBIT A

# INTERIM AGREEMENT, DATED JANUARY 30, 2008

# INTERIM AGREEMENT

The undersigned Employer hereby agrees and stipulates with the Teamsters National Freight Industry Negotiating Committee (hereinafter the Union) as follows:

1.     The undersigned Employer agrees to keep the wages, benefits and working conditions in the National Master Freight Agreement and it's applicable Supplemental Agreements (collectively referred to as the "NMFA"), which expires on March 31, 2008, in effect until such time as the Union negotiates the successor NMFA, which will be designated as the Union's national freight industry standard agreement.   Following ratification of the Union's national standard agreement, the Employer agrees to implement the national standards agreement, which is ratified by the members, retroactive to April 1, 2008.

2.     This Interim Agreement applies to all the Employer's terminals, operations and employees that are presently covered by the freight agreement, which expires March 31, 2008.

3.     The Employer acknowledges its familiarity with the terms and conditions of the National Master Freight Agreement and Supplements for the period 2003-2008 or to such other agreement to which the Employer is signatory and further agrees and acknowledges that complete agreement has not been reached on an agreement to replace the NMFA which expires March 31, 2008. Subject to Paragraph 5 below, the Employer acknowledges the Union's right to strike over the demands for amendments to the NMFA which expires March 31, 2008, and the Employer's right to lock-out employees in support of its proposed amendments to that agreement.

4.     As to such other terms and conditions, the Union represents and the Employer acknowledges, that the Union is not demanding that the Employer, if not a member of the multi-employer unit shall be required to become a party to such unit.

This Interim Agreement shall become effective as of midnight March 31, 2008 and shall continue in full force and effect until final agreement is reached on all terms, conditions and provisions of the successor National Master Freight Agreement and Supplements thereto, and membership ratification of said

Agreement, retroactive to April 1, 2008, at which time this Interim Agreement shall terminate and the Employer shall become party and signatory to such successor National Master Freight Agreement and Supplements thereto in accordance with the provisions thereof.

5.      In consideration of the foregoing, the Teamsters National Freight Industry Negotiating Committee on behalf of the Local Unions it represents agrees not to engage in any strike or work stoppage against the Employer so long as the Employer adheres to the terms and conditions hereof.

Teamsters National Freight
Industry Negotiating Committee

_ABF_____
Employer's Name

_A. Phillips V.P. Labor_____
Typed Name and Title of the Person
Signing for the Employer

_____
Signature

Date: _1/30/08_____

2

# EMPLOYER ABF FREIGHT SYSTEM, INC.

# GRIEVANCE EXHIBIT B

# FORMER APPENDIX A TO 1998-2003 NATIONAL MASTER FREIGHT AGREEMENT

APPENDIX A
WAGE REDUCTION-JOB
SECURITY PLAN GUIDELINES

Note: Each Plan Must be Approved by TNFINC.

_____ Corporation, (hereinafter called the "Company") hereby establishes The Wage Reduction - Job Security Plan, (hereinafter the "Plan") for the benefit of all of its employees. These guidelines for establishing this Plan were created for the express purpose of allowing freight companies the ability to compete and provide job security for Teamster bargaining unit employees. This plan has been approved per Article 6, Section 2, of the National Master Freight Agreement.

1. Employee Eligibility. During the period in which the Plan is effective, each full time employee of the Company (Bargaining Unit and/or Non-Bargaining Unit) shall participate in the Plan. For purposes of the Plan, the term "full time employee" means an employee who is on the seniority list and is scheduled to perform work for the Company when called, including probationary employees and regular employees on lay off status but, excluding casual employees.

2. Equal Sacrifice of Non-Bargaining Unit Employees and their Participation. All non-bargaining unit employees will participate equally in the Plan in accordance with its terms. The Company will continue the past and present practice of sharing the burden of sacrifices among all employees. The Company agrees not to increase wages (including bonuses) and benefits of current non-bargaining unit employees as an overall percentage beyond the effective overall percentage increases to be received by the bargaining unit employees. (This would exclude promotions, new hires and, for example, data processing employees, who may be otherwise impossible to hire or retain). In the event it becomes necessary to exceed this overall percentage increase limit in order to retain employees for the efficient continued operation of the business, the Company would request approval from the TNFINC to do so.

3. Relation to Collective Bargaining Agreement. This Plan will be mandatory for all employees, both bargaining unit and non-bargaining unit, since job security is the number one asset we all hope to share equally. This Plan will be effective on the agreed-to date for all those employees in the entire unit. The Plan will be submitted for secret ballot vote of all bargaining unit employees, and shall be put into effect if seventy-five percent (75%) of the bargaining unit employees voting, vote to adopt the plan.

4. Health, Welfare and Pension Contributions. The Company agrees to continue to pay the full Health, Welfare and Pension contributions and other increases set forth in the National Master Freight Agreement and its Supplements and will continue to be signator to the National Master Freight Agreement for the life of the Plan.

5. Dispute Settlement. As part of the Collective Bargaining Agreement, disputes pertaining to the Plan are subject to the grievance procedure contained in the National

Master Freight Agreement. However, any grievance filed hereunder, by either party, shall be referred directly to the appropriate Regional Joint Area Committee for initial hearing and disposition.

6. Participation. An employee begins or continues participation in the Plan, on the date of Plan implementation or, the first day of the pay period following his/her first day of regular and/or probationary employment subject to the eligibility rules above.

7. New Hire. Newly hired employees subject to New Hire under the National Master Freight Agreement begin participation in the Plan first day of the pay period as a minimum as follows for a 15% Wage Reduction - Job Security Plan:

| Time of Service | Maximum Wage Reduction from New Hire Rate |
|---|---|
| Effective First Day of Employment | Receive 70% of NMFA Wages (%) |
| Effective First Day plus One (1) Year | Receive 75% of NMFA Wages (%) |
| Effective First Day plus 18 Months | Receive 80% of NMFA Wages (%) |
| Effective First Day plus Two (2) Years | Receive 85% of NMFA Wages (%) |

8. Term of Plan. The term of the Plan or continued Plan shall begin on or after April 1, 1998 and shall continue in effect through March 31, 2003 or until a replacement Collective Bargaining Agreement is reached between the parties, whichever is the later.

All Plan years will commence on January 1 and end on December 31. Distribution of net operating profits will be prorated as appropriate for calendar years 1998 and 2003 and correspond with Plan implementation date and Plan termination date as herein provided.

9. Determination and Sharing Of Net Operating Profit. For the period from date of Plan implementation through date of Plan termination as herein provided for a 15% (maximum) plan:

| Overall Expense Ratio Levels | % of Net Operating Profit Retained by Company Employees | % of Net Operating Profit Distributed to Plan Participating (Profit Pool) |
|---|---|---|
| 97.0 or Above | 100% | 0% |
| 96.9 and Below | 50% | 50% |

(Note: The percentage of profit retention below 97.0 set forth above may vary inPlans calling for less than maximum allowable reduction provided in Item #11, pursuant to TNFINC approval.)

(a) As set forth above, the Company will retain all Net Operating Profit amounts on the first three points of the Overall Expense Ratio, i.e., from 97.0 or above, irrespective of what the overall expense ratio is. A substantial portion of such net operating profit on the first three points of the Overall Expense Ratio will be reinvested back into the Company's freight operations for the purpose of continuing to provide job security for all Plan participants. The Company will distribute the requisite percentage of the Net Operating Profit in excess of the first three points of the Overall Expense Ratio, i.e., from 96.9 and below, to the participating employees.

(b) Each participant's proportionate share of the Company's Net Operating Profit (Profit Pool) for each Plan year for which a determination is being made shall equal the ratio of the individual participant's earnings for such plan year (after applicable wage reduction) divided by the total earnings by all eligible employees for such plan year, (after applicable wage reduction) multiplied by the amounts of the Company's Net Operating Profit (Profit Pool) which is available for distribution under the Plan.

For example, the distribution for an employee for the first full Plan year would be:

Individual Participant's Eligible Earnings for the period January 1, through December 31.

------------------------ X

Profit Pool-Net Operating Profits (for the period from January 1 through December 31) available for distribution to Participating Employees

Overall Participating Employees' Eligible Earnings (January 1 through December 31.)

(c) The term "Earnings" means an employee's wage compensation only as reportable for W-2 purposes for any plan year for which a profit sharing determination is being made, less amounts otherwise includable in wage compensation which are attributable to profit sharing distributions received during such Plan year, but attributable to a preceding Plan

year. Earnings attributable to wages shall include vacation, sick pay, holiday pay, funeral leave, jury duty and other paid-for-time not worked.

(d) The term "Net Operating Profit" means all operating revenues attributable to the Company's LTL trucking operations minus all operating expenses, including other expenses and debt interest, and any other non-recurring expenses normally incurred by a regulated general freight carrier, excluding any provision for Plan distributions and income taxes, as defined under generally accepted accounting principles. This does not include extraordinary gains or losses as defined under generally accepted accounting principles.

(e) The term "Overall Expense Ratio" means all expenses excluding any provision for Plan distributions, income taxes and extraordinary losses divided by total revenues excluding extraordinary gains, as defined under generally accepted accounting principles.

(f) The company will provide each employee with an annual report including a basic profit and loss statement, indicating the overall results of the Plan and the individual distribution available to such employee.

10. Distribution of Operating Profit. Distribution of the employees' share of Net Operating Profit as determined under the Plan for each calendar (Plan) year shall be made by the Company within ninety (90) days after the close of the Company's books for such calendar (Plan) year.

11. Wage Reduction. From and after the effective date on which an employee becomes a Participant, each employee will have or will have had his/her gross wages or earnings reduced by %, except for new hires. (See Item 7.) Such wage reduction and/or reduced wages shall include vacation, sick pay, holiday pay, funeral leave, jury duty and other paid for time not worked. Wage or salary increases given during the term of the Plan will be subject to the applicable wage or salary reduction.

12. Income and Employment Tax Withholding. The Company shall withhold all applicable federal, state and local income tax and social security or other tax from employees' wages after the reduction and subsequently from each employee's distribution under the Plan as required by applicable federal, state, or local laws and/or regulations or such greater amount as requested by the employee in writing.

13. Access to Company Financial Records. The Company shall submit an annual operating statement in the format of the ICC report and independent audit to TNFINC, and TNFINC reserves the right on an annual basis to examine the books of the Company or utilize an independent auditor of its choice. In the event an independent auditing firm is utilized by TNFINC, the Company shall pay such independent auditor for such annual audit up to a maximum of five thousand dollars ($5,000). There shall be no inter-company charges initiated under the Plan for the purpose of defeating the Plan. The Company will not change accounting assumptions or practices, except as required to conform to governmental regulation, generally accepted accounting practices or for good

business reasons; and in no event will such assumptions or practices be changed to evade or defeat the purposes of this Plan.

14. Past Practices/Company Operations. The existence and maintenance of this Plan shall not limit or otherwise affect the Company's ability to continue to exercise its managerial discretion regarding the running of the Company's business, consistent with the provisions of the Collective Bargaining Agreement. A committee consisting of at least three (3), but not more than six (6) bargaining unit employees selected from among themselves shall have the right to meet and confer with top management on a semi-annual basis for purposes of being apprised and informed concerning the overall progress and results of the Company's continuing operations. TNFINC will appoint the Chairman of this committee and will have the right to send a representative to any meeting of the committee convened by the Company.

15. Work Preservation. Where legally permissible, the Company agrees not to establish any non-union regular route common carrier dry freight LTL entity. For purposes of this paragraph, the term "Company" includes the holding company. In the event the Company acquires a non-union regular route common carrier dry freight LTL entity whose operations are to be combined with those of the Company, it will negotiate with the Union concerning wages, hours and working conditions for the employees of the acquired entity. If the Company acquires a non-union regular route common carrier dry freight LTL entity which is to be operated separately from the Company, it agrees that it will recognize the Union as the representative of employees of that entity in those jobs comparable to those in the present bargaining unit based on, and after, a check by the Company of union recognition cards if signed by a majority of those employees, and the Company will not oppose or obstruct the Union in its efforts to obtain cards, The Company will then negotiate with the Union concerning wages, hours and working conditions for those employees.

16. Company Agrees Not to Terminate Plan before Termination Date Without Approval of the Union. However, if the Plan is terminated at any time, wage levels will revert or snap back to the full National Master Freight Agreement on a prospective basis and participating employees are fully vested in the pro-rated share of the profits for period of wage reduction.

17. Bankruptcy Protection. If the Company files Chapter 7 or I 1 petition or is placed in involuntary bankruptcy proceeding, this Plan is automatically terminated and wages reverted to full National Master Freight Agreement on a prospective basis unless the Union agrees to continue the Plan.

18. Voluntary Termination of Operation. If the company voluntarily terminates operations before the expiration of the current Collective Bargaining Agreement, the participating employees are fully vested in the prorated share of the profits for the period of wage reduction.

19. Type of Agreement. NMFA with all applicable supplements and all IBT Agreements, whether or not supplemental to the NMFA.

20. Transfer of Ownership. If for any reason the Company is sold, the participating employees are fully vested in the prorated share of the profits for the period of wage reduction.

21. Resignation, Retirement or Other Termination of Employment. Any employee who resigns, retires or otherwise incurs a termination of employment, whether voluntary or involuntary, during the term of the Plan shall receive a pro rata distribution in accordance with paragraph 9 based upon his/her participation in the Plan through the date of his/her resignation, retirement or other termination of employment.

22. Limitation to Current Ownership. Should the Company, at any time subsequent to approval of this Plan, enter into negotiations for the sale of the Company the following is mutually understood:

This Plan is limited to the current ownership, unless such current ownership and prospective purchaser obtain approval for continuance of the Plan from TNFINC after a meeting with TNFINC, such current owner and the prospective purchaser prior to the actual sale. During such meeting the feasibility of employee purchase of the Company will be discussed with the employee committee established in #14 above and with TNFINC.

(COMPANY NAME)

BY:
    --------------------------------------

# EMPLOYER ABF FREIGHT SYSTEM, INC.

## GRIEVANCE EXHIBIT C

## MEMORANDUM OF UNDERSTANDING ON THE WAGE REDUCTION – JOB SECURITY PLAN

## (NMFA AMENDMENT NO. 1)

## MEMORANDUM OF UNDERSTANDING ON THE
## WAGE REDUCTION - JOB SECURITY PLAN

YRC Inc. (successor to and currently doing business as Yellow Transportation and Roadway), USF Holland, Inc. and New Penn Motor Express, Inc. (each "the Employer"), by and through their multi-employer bargaining representative, Trucking Management, Inc. ("TMI"), and the Teamsters National Freight Industry Negotiating Committee ("TNFINC") of the International Brotherhood of Teamsters (the "IBT" or the "Union") hereby establishes The Wage Reduction - Job Security Plan (hereinafter the "Plan") for the benefit of all of their employees. This Plan has been developed for the express purpose of allowing the Employer the ability to compete and provide job security for Teamster bargaining unit employees.  This Plan is not, and is not intended to be, a plan governed by the Employee Retirement Income Security Act of 1974, as amended; rather, this Plan is an amendment to the NMFA per Section 4 that has been referred to as a Plan by the parties.

      1.      **Employee Eligibility.**  During the period in which the Plan is effective (as set forth in Section 4 below), each IBT bargaining unit, full time employee of the Employer shall participate in the Plan. For purposes of the Plan, unless expressly stated to the contrary, the term "employee" means an IBT bargaining unit employee who is on the seniority list and is scheduled to perform work for the Employer when called, including a probationary employee, a regular employee on lay off status and casuals, and including employees who work on a percentage basis less than 40 hours per week.

      2.      **Wage Reduction.**  Effective January 1, 2009, the Employer shall reduce by 10% employees' gross wages or earnings paid, including the increases to wages described below in this Section 2 and the reduced wages in Section 8 below. Such wage reduction and/or reduced earnings shall include overtime and any premium pay, vacation, sick pay, holiday pay, funeral leave, jury duty, and other paid for time not worked.  Wage and mileage rate increases outlined in Article 33 of the NMFA, effective April 1, 2009, April 1, 2010, April 1, 2011, and April 1, 2012 shall also be reduced by 10%. On March 31, 2013, the wage reduction contained in this Plan shall be eliminated, and the wages under the NMFA shall revert to the full rate which would be in effect under the NMFA on March 31, 2013 without the wage reduction.  The cost of living adjustment provisions of Article 33 of the NMFA shall be suspended for the duration of the NMFA.

      3.      **Equal Sacrifice of Non-Bargaining Unit Employees and their Participation.**

(a) All non-bargaining unit employees (including management) will participate equally in the Plan, and the Employer will share the burden of sacrifices among all IBT bargaining unit and non-bargaining unit employees (including management), in each case, as described in this Section 3(a). The Employer must reduce the total compensation (defined as wages plus health and welfare and pension or retirement benefits) of all non-bargaining unit employees (including management) by the same percentage reduction (an "Equal Reduction") in total compensation as is being applied to IBT bargaining unit employees. In determining the Equal Reduction for non-bargaining unit employees under this Plan, the Employer may include the monetary value of the following concessions imposed on non-bargaining unit employees in 2008: termination of retiree medical,

suspension of the defined contribution pension plan, freezing of the defined benefit pension plan, increase in the cost of health care, and the elimination of wage increases for 2009. Effective January 1, 2009, additional wage and benefit concessions must be imposed on non-bargaining unit employees to the extent needed to create an Equal Reduction. The Employer agrees not to increase wages (including bonuses) and benefits of current non-bargaining unit employees (including management) as an overall percentage beyond the effective overall total compensation percentage increases to be received by the bargaining unit employees. This shall not prevent the Employer from paying variable, performance based compensation as the Employer has paid in past practice. In the event it becomes necessary to exceed this overall percentage increase limit in order to retain employees for the efficient continued operation of the business, the Employer would request approval from the Subcommittee established in Section 11 below.

(b) The Employer and TNFINC agree to use their reasonable best efforts to achieve equal sacrifice in the total compensation of employees covered by non-Teamster and non-NMFA collective bargaining agreements.

4. **Effective Dates; Relation to Collective Bargaining Agreement.** This Plan will be mandatory for all employees, since job security is the number one asset the Employer, the Union and the employees all hope to share equally. This Plan will be submitted for secret ballot vote of all bargaining unit employees, and shall be put into effect if 50% plus one (1) of the bargaining unit employees voting, vote to adopt the Plan. The Plan will be effective on the first day of the first payroll period commencing after the date of ratification of the Plan (the "Effective Date"). This Plan terminates on March 31, 2013. This Plan is incorporated by reference into and shall be a part of the 2008-2013 National Master Freight Agreement and its Supplements (collectively referred to as "the NMFA"). If this Plan is not ratified by those employees of YRC Inc. and USF Holland Inc. that are covered by the NMFA by January 1, 2009, Employer may terminate this Plan and the warrants in Section 9 shall terminate and be forfeited.

5. **Health, Welfare and Pension Contributions.** The Employer agrees to continue to pay the full Health, Welfare and Pension contributions and increases in said contributions set forth in the NMFA and other Teamster bargaining agreements that accept the terms of this Plan and will continue for the life of this Plan to be signatory to such bargaining agreements.

6. **Dispute Settlement.** Disputes pertaining to the Plan are subject to the grievance procedure contained in the NMFA. However, any grievance filed hereunder, by either party, shall be referred initially to the Subcommittee established in Section 11 for disposition. If the Subcommittee fails to reach agreement, the matter will be referred to the Chairman of TNFINC and the President of the Employer in accordance with Article 8, Section 2(b)(2) of the NMFA. If the Chairman of TNFINC and the President of the Employer are unable to resolve the matter, the 30 additional days provided in Article 8, Section 2(b)(2) of the NMFA shall be considered as exhausted and the remaining provisions of Article 8, Section 2 shall govern.

7. **Participation.** An employee begins or continues participation in the Plan on the date of Plan implementation or the first day of the pay period following his/her

first day of regular and/or probationary employment.

### 8.   New Hire.

#### A.   Non-CDL Qualified Employees

Non-CDL qualified employees (excluding mechanics) hired after the effective date of the Plan begin participation in the Plan on their first day of employment at the following wage progression:

| Time of Service | Maximum Wage Reduction from New Hire Rate Prior to Reduction in Section 2 Above |
|---|---|
| Effective First Day of Employment | Receive 70% of NMF A Wages |
| Effective First Day plus One (1) Year | Receive 75% of NMF A Wages |
| Effective First Day plus Two (2) Years | Receive 80% of NMFA Wages |
| Effective First Day plus Three (3) Years | Receive 100 % of NMFA Wages |

"NMFA Wages" means 100% of the full NMFA rate for the applicable job classification after the agreed upon wage reduction.

#### B.   CDL Qualified or Mechanics

CDL qualified employees and mechanics hired after the effective date of the Plan begin participation in the Plan on their first day of employment at the following wage progression:

| Time of Service | Maximum Wage Reduction from New Hire Rate Prior to Reduction in Section 2 Above |
|---|---|
| Effective First Day of Employment | Receive 85% of NMFA Wages |
| Effective First Day plus One (1) Year | Receive 90% of NMFA Wages |
| Effective First Day plus Two (2) Years | Receive 95% of NMFA Wages |
| Effective First Day plus Three (3) Years | Receive 100 % of NMFA Wages |

"NMFA Wages" means 100% of the full NMFA rate for the applicable job classification after the agreed upon wage reduction.

### 9.   Warrants.

Upon the Effective Date, warrants to purchase common stock of YRC Worldwide Inc. ("YRCW") shall be issued to a trust or plan, the terms of which shall be agreed among the parties, for the benefit of employees (excluding casuals) sufficient to provide IBT-represented employees of the Employer who are participants in

-3-

the Plan with 15% of the equity of YRCW as of the issuance date. The warrants shall contain customary anti-dilution terms, registration rights and other terms to be agreed among the parties and shall be exercisable on January 1, 2010. The warrants shall expire on March 31, 2018. The warrants shall have an exercise price per share equal to the reporting closing price per share of YRCW common stock on the Effective Date. The parties shall work in good faith to establish a structure for a plan or trust to deliver the value of the warrants to the employees. It is the intent of the parties to optimize the tax structure such that the Employer receives a tax deduction of the warrant/share compensation paid to employees under this Section 9 and the IBT has adequate oversight over the trust or plan.. The trust or plan shall not transfer the warrants but may transfer the shares received upon exercise of the warrants. Employees shall receive the benefit of the shares received upon exercise of the warrants on a reasonable pro rata basis to be agreed upon by the parties. For any employee who resigns, retires, dies or otherwise incurs a termination of employment, whether voluntary or involuntary, the employee (or his or her estate as applicable) shall continue to participate in the warrant trust or plan on the basis of the employee's savings contributions made through termination. If the Employer voluntarily terminates operations before the expiration of the current NMFA, the participating employees will continue to participate in the warrant trust or plan. If there is a change of control of YRC Worldwide Inc., the warrants shall accelerate their vesting and the Employees shall continue their participation in the warrant trust or plan.

10.    **Access to Employer Financial Records.** The Employer shall submit an annual financial statement in the format of the BTS report to the Subcommittee established by Section 11, and TNFINC reserves the right on an annual basis to examine records of the Employer reasonably required to monitor Employer compliance with this Plan or utilize an independent auditor of its choice to do the same. Notwithstanding any request to the contrary, given applicable privacy laws and policies and for the protection of its bargaining and non-bargaining unit employees alike, the Employer will not share employee specific compensation information with the Subcommittee, TNFINC, the Union or any auditor other than the compensation information that Employer is required to publicly provide pursuant to Securities and Exchange Commission regulation. In the event an independent auditing firm is utilized by TNFINC, the Employer shall pay such independent auditor for such annual audit up to a maximum of ten thousand dollars ($10,000). As a condition of being provided such statements, books and audit, TNFINC and the Subcommittee (and any accountant or auditor engaged on its behalf) must agree to maintain the confidentiality of any Employer financial statements and reports for the protection of the Employer, and to execute a reasonable confidentiality agreement if requested by the Employer in such form as the Employer may reasonably require.

11.    **Subcommittee to Monitor and Maintain Compliance.** For purposes of monitoring and maintaining compliance with the terms of this Plan, the parties will establish a four person Subcommittee consisting of the Chairman of TNFINC or his designee, the Co-Chairman of TNFINC or his designee, the Employer's President or his designee and another officer of Employer or his designee. The Subcommittee shall meet quarterly, or more frequently if necessary, to exchange and discuss pertinent data, including but not limited to relevant payroll and related information, the reinvestment of capital into the Employer, and any and all subjects related to the financial operations of the Employer. The Subcommittee's decision regarding the interpretation of this Plan

shall be final and binding.

12.    **Work Preservation.**  The Employer agrees not to establish or buy any new non-union regular route common carrier freight LTL entity without the prior approval of the Union.  The Employer agrees that it will not use any of the savings and other economic benefits derived from this Plan to provide capital to its parent for the purposes of significantly expanding the domestic and Canadian operations of YRC Logistics or any operations of the company that are not located in the U.S. or Canada.  This Section 12 does not apply to the maintenance of existing operations or any existing contractual commitments.

13.    **Termination.**  The Employer agrees not to terminate the Plan before the termination date without approval of the Union.  However, if the Plan is terminated with approval of the Union at any time, wage levels will revert or snap back to the full NMFA on a prospective basis, the warrants issued pursuant to Section 9 shall terminate and be forfeited and all other provisions of this Plan shall be null and void on a prospective basis, including (without limitation) Section 3..

14.    **Bankruptcy Protection.**  If the Employer files a Chapter 7 or 11 bankruptcy petition or is placed in involuntary bankruptcy proceeding, this Plan is automatically terminated and wages reverted to full NMFA on a prospective basis, unless the Union agrees in writing to continue the Plan, the warrants issued pursuant to Section 9 shall terminate and be forfeited and all other provisions of this Plan shall be null and void on a prospective basis, including (without limitation) Section 3.

15.    **Type of Agreement.**  This Plan shall be applicable to the NMFA and its supplements, which have been agreed to by the Employer and TNFINC.

16.    **Fees and Expenses.**  The Employer shall bear all fees, costs, and expenses of the IBT (including, without limitation, fees, costs and expenses of financial advisors or other representatives) incurred in connection with the negotiation of this Plan in an amount agreed to among the parties.

17.    **Card Check and Neutrality.**  Solely as to new non-union regular route common carrier freight LTL entities that Employer, its parent or holding company or subsidiaries of the Employer buy or establish on or after the date hereof, the parties to this Plan agree that, as soon as a Teamster Local Union, shows the new entity authorization cards signed by the majority of employees in the bargaining unit, the Local Union will be recognized as the exclusive bargaining representative for those employees.  The Employer or its affiliated companies will remain neutral if the Local Union seeks to represent unrepresented employees for such a new entity.  Neutrality means that the new entity will not make statements or take other actions opposing or advocating unionization.  The new entity shall not demean the Union as an organization or its representatives as individuals.  The new entity will inform all managerial employees and supervisors of their obligation under this neutrality agreement and will take prompt action to correct any violation of this Section 17.  Disputes regarding the application of this Section 17 shall be resolved on an expedited basis by the Subcommittee established in Section 11.

18.    **Representations/Warranties.** The effectiveness of the Plan shall be conditioned

-5-

upon the delivery from each of the chief executive officer and chief financial officer of YRCW of a compliance certificate to TNFINC on the Effective Date containing the following:

> To my knowledge, based on due and reasonable inquiry, including a detailed review of the financial condition of YRC Worldwide Inc., after giving effect to this Plan, on the date of this certificate, there exists no event or condition which constitutes an default (as defined in the Credit Agreement dated August 17, 2007, as amended, among YRC Worldwide Inc., JP Morgan Chase, National Association, as administrative agent, the lenders a party thereto, the additional borrows a party thereto) or which upon notice, lapse of time or both would, unless cured or waived, become or lead to such a default. The foregoing representation is based solely upon the facts on the date this certificate is made.

The parties agree that there shall be no cause of action against the officers who give this certificate or YRCW for punitive or consequential damages as a result of the inaccuracy of the representation in such certificate, except in the case of intentional fraud, willful misconduct or gross negligence.

19. **Current Ownership.** If a Change of Control of Employer (as defined below) occurs other than through a confirmation of a plan of reorganization in a Chapter 11 proceeding, this Plan is automatically terminated and wages reverted to full NMFA on a prospective basis unless the Union agrees in writing to continue the Plan, the warrants issued pursuant to Section 9 shall terminate and be forfeited and all other provisions of this Plan shall be null and void on a prospective basis, including (without limitation) Section 3. For the purposes of this Section 19, a "Change of Control," shall be deemed to have taken place if a third person, including a "group" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, purchases or otherwise acquires shares of YRCW after the date of this Agreement that, together with stock held by such person or group, constitutes more than 50 percent of the total voting power of the stock of YRCW where the current directors of YRCW (or directors that they nominate or their nominees nominate) no longer continue to hold more than 50% of the voting power of the board of directors).

20. **Severability.** The invalidity or unenforceability of any provision of this Plan shall not affect the validity or enforceability of any other provisions of this Plan, which shall remain in full force and effect.

21. **Ratification.** For the purposes of ratification, YRC Inc. and USF Holland Inc. shall be treated as one voting unit, and New Penn Motor Express, Inc. shall be treated as a separate voting unit.

In Witness of the foregoing Plan, the parties hereby acknowledge the Plan:

**YRC Inc., USF Holland, Inc., New Penn Motor Express, Inc., and TMI:**

By: _____

Date: _____

**Teamsters National Freight Industry Negotiating Committee:**

By: _____

Date: _____

-7-

## LETTER OF AGREEMENT
## ON THE
## FEES, COSTS AND EXPENSES OF ADVISORS

YRC Inc. (successor to and currently doing business as Yellow Transportation and Roadway), USF Holland, Inc. and New Penn Motor Express, Inc. (each "the Employer"), by and through their multi-employer bargaining representative, Trucking Management, Inc. ("TMI"), and the Teamsters National Freight Industry Negotiating Committee ("TNFINC") affiliated with the International Brotherhood of Teamsters (the "IBT" or the "Union") hereby enter into this Letter of Agreement that provides as follows:

> The Employer shall bear all fees, costs, and expenses incurred by financial advisors or other representatives who were retained by the IBT in connection with the negotiation of the Wage Reduction – Job Security Plan up to $200,000.00.

YRC Inc., USF Holland, Inc., New Penn Motor Express, Inc., and TMI:

By: _____

Date: _____


Teamsters National Freight Industry Negotiating Committee:

By: _____

Date: _____

## LETTER OF AGREEMENT

YRC Inc. (successor to and currently doing business as Yellow Transportation and Roadway), USF Holland, Inc. and New Penn Motor Express, Inc. (each "the Employer"), by and through their multi-employer bargaining representative, Trucking Management, Inc. ("TMI"), and the Teamsters National Freight Industry Negotiating Committee ("TNFINC") affiliated with the International Brotherhood of Teamsters (the "IBT" or the "Union") hereby enter into this Letter of Agreement that provides as follows:

> If during the term of the Wage Reduction – Job Security Plan the parties are permitted to reduce the Employer pension contributions without impacting the funding levels of the applicable pension plans, the Subcommittee established by the Plan to monitor and maintain compliance with the Plan may restore the wage and mileage reductions to the extent of the pension contribution reductions.

YRC Inc., USF Holland, Inc., New Penn Motor Express, Inc., and TMI:

By: _____

Date: _____


Teamsters National Freight Industry Negotiating Committee:

By: _____

Date: _____

**EMPLOYER ABF FREIGHT SYSTEM, INC.**

**GRIEVANCE EXHIBIT D**

**THE AMENDED AND RESTATED MEMORANDUM OF UNDERSTANDING ON THE JOB SECURITY PLAN**

**(NMFA AMENDMENT NO. 2)**

# AMENDED AND RESTATED MEMORANDUM OF UNDERSTANDING ON THE JOB SECURITY PLAN

YRC Inc., USF Holland, Inc. and New Penn Motor Express, Inc. (each "the Employer") and the Teamsters National Freight Industry Negotiating Committee ("TNFINC") of the International Brotherhood of Teamsters (the "IBT", the "Teamsters" or the "Union") hereby establish this Second Amended and Restated Job Security Plan (this "Revised Plan") for the benefit of all of their employees. This Revised Plan has been developed for the express purpose of allowing the Employer the ability to compete and provide job security for Teamster bargaining unit employees.  This Revised Plan is not, and is not intended to be, a plan that the Employee Retirement Income Security Act of 1974, as amended, governs; rather, this Revised Plan is an amendment to the NMFA (defined below) that the parties have referred to as the Revised Plan.  As used in this Revised Plan, "NMFA" means collectively the 2008-2013 National Master Freight Agreement and its applicable supplemental agreements.

      1.    **Employee Participation.**  During the period in which this Revised Plan is effective (as set forth in Section 5), each IBT bargaining unit, full-time employee of the Employer shall participate in the Revised Plan. For purposes of the Plan, unless expressly stated to the contrary, the term "employee" means an IBT bargaining unit employee who is on the seniority list and is scheduled to perform work for the Employer when called, including a probationary employee, a regular employee on lay off status and casuals, and including employees who work on a percentage basis less than 40 hours per week.

      2.    **Non-Permanent Pension Contribution Termination and Deferral.**

      (a)    Notwithstanding any other provision of this Revised Plan, the obligation of the Employers to contribute to the Pension Funds covered by the NMFA ("Funds") shall cease effective July 1, 2009 through December 31, 2010 ("Non-Permanent Pension Contribution Termination Period"). During the Non-Permanent Pension Contribution Termination Period, each Employer may terminate its participation in the multi-employer pension funds (each a "Fund") in which it participates; it being understood that such termination shall result in the cessation of any accruals of benefits for the months in the Non-Permanent Pension Contribution Termination Period; it being further understood that the Employers shall not be required to provide contributions to these Funds for the Non-Permanent Pension Contribution Termination Period.  At the end of the Non-Permanent Pension Contribution Termination Period, each Employer shall resume its participation in those Funds by resuming pension contributions. The parties agree that on this basis, the Employers intend to continue their participation in each Fund.  To the extent consent is necessary, TNFINC and each Employer consent to actions by Fund trustees to reduce pension accruals to zero during the Non-Permanent Pension Contribution Termination Period.   TNFINC and each Employer agree to use their respective reasonable best efforts to encourage the trustees of each Fund to enter into a reasonably acceptable Non-Permanent Pension Contribution Termination Period Agreement, which shall avoid any debt or accumulated pension obligations of the Employers.  The obligation of the Employers to contribute to the Funds shall resume

effective January 1, 2011 or earlier if the Employers satisfy certain financial benchmarks established by the Subcommittee (defined in Section 13).   The resumption of the Employers' obligation to contribute to the Funds shall be at rates, terms and conditions approved by the Funds.

(b)   It is hereby acknowledged that the Employers have deferred contributions to Funds and expect to defer such contributions with respect to hours worked until immediately prior to the beginning of the Non-Permanent Pension Contribution Termination Period.   To the extent any of those deferrals occurred before or occur after the Effective Date and the respective applicable Funds and Employers enter into deferral agreements, the Employers shall not be in breach of the NMFA (as amended by this Revised Plan), and no legal, strike (pursuant to Article 8, Section 3(b) of the NMFA) or other action shall be taken against Employers so long as Employers are not materially in default of the deferral agreements and related documents (as they may be amended from time to time).   If an Employer is in material default of a deferral agreement or related document, before any legal, strike or other action is taken against Employer, the Subcommittee (defined in Section 13) must provide written notice to the Employer, and the Employer shall have 30 days to cure the default.   If the default is cured, any applicable legal, strike or other action shall be rescinded or dismissed, and TNFINC shall use its reasonable best efforts to ensure that any such action is rescinded or dismissed.   If prior to the Effective Date, a Fund terminated an Employer, the Employer shall have no obligation to provide contributions to the Fund for the period between such termination and the Effective Date.

3.   **Wage Reduction.**   Effective August 1, 2009, the Employer shall reduce by 15% employees' gross wages or earnings paid per the NMFA (but before the Prior Plan), including the increases to wages described below in this Section 3 and the reduced wages in Section 10. (This includes the 10% reduction previously taken in Section 2 of the Prior Plan).   Such wage reductions and/or reduced earnings shall include overtime and any premium pay, vacation, sick pay, holiday pay, funeral leave, jury duty, and other paid for time not worked.   Wage and mileage rate increases outlined in Article 33 of the NMFA, effective April 1, 2010, April 1, 2011 and April 1, 2012 shall also be reduced by 15%.

4.   **Equal Sacrifice of Non-Bargaining Unit Employees and their Participation.**

(a)   All non-bargaining unit employees (including management) will participate equally in the Revised Plan, and the Employer will share the burden of sacrifices among all IBT bargaining unit and non-bargaining unit employees (including management), in each case, as described in this Section 4(a). The Employer must reduce the total compensation (defined as wages plus health and welfare and pension or retirement benefits) of all non-bargaining unit employees (including management) by the same percentage reduction (an "Equal Reduction") in total compensation as is being applied to IBT bargaining unit employees. In determining the Equal Reduction for non-bargaining unit employees under this Plan, the Employer may include the monetary value of the following concessions imposed on non-bargaining unit employees beginning in 2008:

(i)      termination of retiree medical,

(ii)     suspension of the defined contribution pension plan,

(iii)    the suspension of Employer matching contributions to 401(k) accounts,

(iv)     freezing of the defined benefit pension plan,

(v)      increases in the cost of health care,

(vi)     the elimination or reduction of wage increases for 2009, and

(vii)    the suspension of normal performance incentive and equity awards..

On January 1, 2009, additional wage and benefit concessions were imposed on non-bargaining unit employees to the extent needed to create an Equal Reduction under the Prior Plan.  As of the Effective Date, each Employer will make permanent the wage reductions originally in the Prior Plan.  During the Non-Permanent Pension Contribution Termination Period, the Employer will be prohibited from making any contributions to Employer provided retirement or pension plans, 401(k) accounts or other retirement vehicles including any defined contribution or defined benefit plans for non–bargaining unit employees (including management).  The Employer agrees not to increase wages (including bonuses) and benefits of current non-bargaining unit employees (including management) as an overall percentage beyond the effective overall total compensation percentage increases to be received by the bargaining unit employees. This shall not prevent the Employer from paying variable, performance based compensation as the Employer has paid in past practice.  This shall also not prevent the Employer from providing targeted increases to individual employees if necessary, in Employer's judgment, to operate the business so long as the overall total compensation increases are within the effective overall total compensation percentage increases to be received by the bargaining unit employees.  If it becomes necessary to exceed this overall percentage increase limit to retain employees for the efficient continued operation of the business, the Employer would request approval from the Subcommittee.  The Employer will be permitted to re-instate merit increases in 2010; *provided* that the Employer's financial condition can support any increase to base wages.

(b)      All remaining non-Teamsters represented employees of USF Reddaway, USF Glen Moore, Reimer and YRC Logistics shall share equal sacrifice in total compensation as those employees covered by non-NMFA collective bargaining agreements.  To that end, it is agreed that immediately upon the Teamster-represented employees of the respective business unit voting to accept a wage reduction or pension and 401(k) contribution suspensions necessary to achieve such equal sacrifice, the equivalent equal sacrifice reductions shall be imposed on non-Teamster represented employees of that same operating company.  The Employer and TNFINC shall cooperate in achieving the equal sacrifice among Canadian employees of Reimer, and recognize such efforts must be in compliance with applicable Canadian federal and provincial law.

(c)      The Employer and TNFINC agree to use their reasonable best efforts to achieve equal sacrifice in the total compensation of employees covered by non-Teamster and non-NMFA collective bargaining agreements.

5.     **Effective Dates; Relation to Collective Bargaining Agreement.**  This Revised Plan will be mandatory for all employees, since job security is the number one asset the Employer, the Union and the employees all hope to share equally.  This Revised Plan will be submitted for secret ballot vote of all bargaining unit employees, and shall be put into effect if 50% plus one of the bargaining unit employees voting, vote to adopt the Revised Plan. The Revised Plan will be effective on the first day of the first payroll period commencing after the date of ratification of the Revised Plan (the "Effective Date").   This Revised Plan terminates on March 31, 2013. This Revised Plan is incorporated by reference into and shall be a part of the NMFA.

6.     **Health & Welfare and Pension Contributions.**

(a)     The increase in Employer contributions to health, welfare and pension that the NMFA requires (i) on August 1, 2009 shall be reduced to $0.20 per hour; (ii) on August 1, 2010 shall be reduced to $0.40 per hour; (iii) on August 1, 2011 shall remain $1.00 per hour; and (iv) on August 1, 2012 shall remain $1.00 per hour.  The contractual provision in the NMFA supplemental agreements authorizing the Supplemental Negotiating Committee to determine the allocation of the health, welfare and pension contribution increases shall be suspended during the Non-Permanent Pension Contribution Termination Period.   The contribution increases made during the Non-Permanent Pension Contribution Termination Period shall be made only to health and welfare funds.

(b)     At the end of the Non-Permanent Pension Contribution Termination Period, the Employer will commence contributing the total contribution for health, welfare and pension the NMFA (as modified by this Revised Plan) requires.  At the end of the Non-Permanent Pension Contribution Termination Period, as required by the applicable NMFA supplemental agreements, the Supplemental Negotiating Committee will determine the allocation of the contribution rate increase between the health and welfare and pension funds, as approved by the applicable Fund.

7.     **Extension of Recall for Laid off Teamsters.**  The NMFA is amended to increase the recall rights of laid off bargaining unit employees from five (5) years to ten (10) years.   Accordingly, Article 5, Section 1(b) of the NMFA is amended to read: "Seniority shall be broken only by discharge, voluntary quit, retirement, or more than ten (10) –year layoff."

8.     **Dispute Settlement.**  Disputes pertaining to this Revised Plan are subject to the grievance procedure contained in the NMFA.   However, any grievance filed hereunder, by either party, shall be referred initially to the Subcommittee for disposition. If the Subcommittee fails to reach agreement, the matter will be referred to the Chairman of TNFINC and the President of the Employer in accordance with Article 8, Section 2(b)(2) of the NMFA.  If the Chairman of TNFINC and the President of the Employer are unable to resolve the matter, the 30 additional days provided in Article 8, Section 2(b)(2) of the NMFA shall be considered as exhausted and the remaining provisions of Article 8, Section 2 shall govern.

9.     **Participation.**  An employee begins or continues participation in this Revised Plan on the Effective Date of Revised Plan or the first day of the pay period following his/her first day of regular and/or probationary employment.

10. **New Hire.**

(a) <u>**Non-CDL Qualified Employees**</u>

Non-CDL qualified employees (excluding mechanics) hired after the Effective Date begin participation in the Revised Plan on their first day of employment at the following wage progression:

| Time of Service | Maximum Wage Reduction from New Hire Rate Prior to Reduction in Section 3 Above |
|---|---|
| Effective First Day of Employment | Receive 70% of NMF A Wages |
| Effective First Day plus One (1) Year | Receive 75% of NMF A Wages |
| Effective First Day plus Two (2) Years | Receive 80% of NMFA Wages |
| Effective First Day plus Three (3) Years | Receive 100 % of NMFA Wages |

"NMFA Wages" means 100% of the full NMFA rate for the applicable job classification after the agreed upon wage reduction.

(b) <u>**CDL Qualified or Mechanics**</u>

CDL qualified employees and mechanics hired after the Effective Date begin participation in the Revised Plan on their first day of employment at the following wage progression:

| Time of Service | Maximum Wage Reduction from New Hire Rate Prior to Reduction in Section 3 Above |
|---|---|
| Effective First Day of Employment | Receive 85% of NMFA Wages |
| Effective First Day plus One (1) Year | Receive 90% of NMFA Wages |
| Effective First Day plus Two (2) Years | Receive 95% of NMFA Wages |
| Effective First Day plus Three (3) Years | Receive 100 % of NMFA Wages |

"NMFA Wages" means 100% of the full NMFA rate for the applicable job classification after the agreed upon wage reduction.

11. **Employee Stock Option Plan.** Upon the Effective Date, a stock option plan (the "New Stock Option Plan") shall be established to provide eligible employees with options to purchase the common stock of Employer's parent company, YRC Worldwide Inc. ("YRCW") equal to 20% of YRCW's outstanding shares on a fully diluted basis as if all outstanding stock option were exercised as of the Effective Date. The stock option plan shall have substantially similar terms to the Union Employee Option Plan dated February 12, 2009 (the "Prior Option Plan") and shall be in addition to the Prior Option Plan. Any such options shall not be issued until any applicable vote of YRCW's shareholders to approve the stock option plan is obtained. If such vote is not obtained within one year, a stock appreciation rights plan shall be established with substantially similar terms as the Union Employee Stock Appreciation Rights Plan dated February 12, 2009, which would be in addition to the Prior Option Plan but in lieu of the

New Stock Option Plan.

12.     **Access to Employer Financial Records.**  The Employer shall submit an annual financial statement in the format of the BTS report to the Subcommittee, and TNFINC reserves the right on an annual basis to examine records of the Employer reasonably required to monitor Employer compliance with this Revised Plan or utilize an independent auditor of its choice to do the same.  Notwithstanding any request to the contrary, given applicable privacy laws and policies and for the protection of its bargaining and non-bargaining unit employees alike, the Employer will not share employee specific compensation information with the Subcommittee, TNFINC, the Union or any auditor other than the compensation information that Employer is required to publicly provide pursuant to Securities and Exchange Commission regulation. As a condition of being provided such statements, books and audit, TNFINC and the Subcommittee (and any accountant or auditor engaged on its behalf) must agree to maintain the confidentiality of any Employer financial statements and reports for the protection of the Employer, and to execute a reasonable confidentiality agreement if the Employer requests in such form as the Employer may reasonably require.  Additionally, the Employer shall provide to TNFINC and any advisor designated by TNFINC, subject to a reasonable confidentiality agreement that the Employers require, all information required under Sections 5.01(a)-(j), (l) of the Credit Agreement dated August 17, 2007 among YRC Worldwide Inc., JP Morgan Chase, National Association as administrative agent, the lenders that are a party thereto, and the additional borrowers that are a party thereto, as amended and modified from time to time within the delivery timeframes required under such agreement until the expiration of the NMFA.

13.     **Subcommittee to Monitor and Maintain Compliance.**  For purposes of monitoring and maintaining compliance with the terms of this Revised Plan (and for prior periods, the Prior Plan), the parties will continue the four person Subcommittee that the Prior Plan established consisting of the Chairman of TNFINC or his designee, the Co-Chairman of TNFINC or his designee, the Employer's President or his designee and another officer of Employer or his designee. The Subcommittee shall meet quarterly or more frequently if necessary, to exchange and discuss pertinent data, including relevant payroll and related information, the reinvestment of capital into the Employer and any and all subjects related to the financial operations of the Employer.  The Subcommittee's decision regarding the interpretation of this Revised Plan (and for prior periods, the Prior Plan) shall be final and binding.  The Subcommittee may retain financial consultants to assist them in performing their obligations under their Agreement.

14.     **Work Preservation.**

(a)     The Employers agree not to establish or buy any new non-union regular route common carrier entity without the prior approval of the Union.  The Employer agrees that it will not use any of the savings and other economic benefits derived from this Revised Plan or the Prior Plan to provide capital to its parent for the purposes of significantly expanding the domestic and Canadian operations of YRC Logistics or any operations of the Employer that are not located in the U.S. or Canada.  This Section 14 does not apply to the maintenance of existing operations or any existing contractual commitments.

(b)     In recognition of allegations that the Employers have diverted work to YRC Logistics, the parties agree the Subcommittee (described in Section 13) shall review such allegations, address violations, and, where cost effective and permitted by the customer, transfer work from YRC Logistics to the Employers.  Any disputes regarding YRC Logistics shall be referred to the Subcommittee established in Section 13 for resolution.  In addition, YRC Logistics will not perform or use subcontractors to provide city-to-city LTL carrier services.

(c)     The Employer agrees that it will not transfer payroll or other bargaining unit work to India or any other country and will return any payroll work performed by the bargaining unit beginning upon ratification and shall be concluded within four (4) months thereafter.  The Subcommittee will review the Employers' compliance with this Section 14(c) during the first quarter of 2010.

15.     **Termination.**  If this Revised Plan is not ratified by those employees of Employers that are covered by the NMFA by August 1, 2009, or if Funds representing 90% of the Employers' collective monthly contributions to the Funds do not enter into a Non-Permanent Pension Contribution Termination Period arrangement with the Employers as described in Section 2(a) by August 1, 2009, each Employer may terminate this Plan and any unvested stock options (or stock appreciation rights) in Section 11 shall be cancelled and forfeited.  Each Employer agrees not to terminate the Revised Plan before August 1, 2009 without approval of the Union.  However, if prior to August 1, 2009, the Revised Plan is terminated with approval of the Union, wage levels will revert or snap back to the NMFA as modified by the Prior Plan on a prospective basis, any unvested stock options (or stock appreciation rights) pursuant to Section 11 shall be cancelled and forfeited and all other provisions of this Plan shall be null and void on a prospective basis, including Section 3.

16.     **Bankruptcy Protection.**  The purpose of this Revised Plan is to make a financial accommodation for the benefit of the Employer, within the meaning of section 365(e)(2) of the Bankruptcy Code.  Accordingly, if the Employer files a Chapter 7 or 11 bankruptcy petition or is placed in an involuntary bankruptcy proceeding, this Revised Plan is automatically terminated and wages reverted to full NMFA on a prospective basis, unless the Union agrees in writing to continue the Plan, any unvested stock options (or stock appreciation rights) pursuant to Section 11 shall be cancelled and forfeited and all other provisions of this Revised Plan shall be null and void on a prospective basis, including Section 3.

17.     **Type of Agreement.**  This Revised Plan shall be applicable to the NMFA and its supplements that have been agreed to by the Employer and TNFINC.

18.     **Card Check and Neutrality.**  As to any non-union common carrier freight entity that the Employer, its parent or holding company or subsidiaries of the Employer buys, establishes or maintains, the parties to this Revised Plan agree that, as soon as a Teamster Local Union shows the entity authorization cards signed by the majority of employees in the bargaining unit, the Local Union will be recognized as the exclusive bargaining representative for those employees. The Employer or its affiliated companies will remain neutral if the Local Union seeks to represent unrepresented employees for this new entity. Neutrality means that the new entity will not make

statements or take other actions opposing or advocating unionization. The new entity shall not demean the Union as an organization or its representatives as individuals. The new entity will inform all managerial employees and supervisors of their obligation under this neutrality agreement and will take prompt action to correct any violation of this Section 18. Disputes regarding the application of this Section 18 shall be resolved on an expedited basis by the Subcommittee.

19.   **Leave of Absence.**   During the Non-Permanent Pension Contribution Termination Period, bargaining unit employees who are participating in this Revised Plan will be permitted to take a leave of absence without pay.

20.   **Representations/Warranties.** The effectiveness of the Revised Plan shall be conditioned upon the delivery from each of the chief executive officer and chief financial officer of YRCW of a compliance certificate to TNFINC on the Effective Date containing the following:

> To my knowledge, based on due and reasonable inquiry, including a detailed review of the financial condition of YRC Worldwide Inc., after giving effect to this Revised Plan, on the date of this certificate, there exists no event or condition which constitutes an default (as defined in the Credit Agreement dated August 17, 2007, as amended, among YRC Worldwide Inc., JP Morgan Chase, National Association, as administrative agent, the lenders a party thereto, the additional borrows a party thereto) or which upon notice, lapse of time or both would, unless cured or waived, become or lead to such a default. The foregoing representation is based solely upon the facts on the date this certificate is made.

The parties agree that there shall be no cause of action against the officers who give this certificate or YRCW for punitive or consequential damages as a result of the inaccuracy of the representation in such certificate, except in the case of intentional fraud, willful misconduct or gross negligence.

21.   **Current Ownership.**   If a Change of Control of Employer (as defined below) occurs other than through a confirmation of a plan of reorganization in a Chapter 11 proceeding, this Revised Plan is automatically terminated and wages reverted to full NMFA on a prospective basis unless the Union agrees in writing to continue the Revised Plan, any unvested stock options (or stock appreciation rights) pursuant to Section 11 shall be cancelled and forfeited and all other provisions of this Revised Plan shall be null and void on a prospective basis, including Section 3. For the purposes of this Section 21, a "Change of Control," shall be deemed to have taken place if a third person, including a "group" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, purchases or otherwise acquires shares of YRCW after the date of this Agreement that, together with stock held by such person or group, constitutes more than 50 percent of the total voting power of the stock of YRCW where the current directors of YRCW (or directors that they nominate or their nominees nominate) no longer continue to hold more than 50% of the voting power of the board of directors).

22.   **Severability.**  The invalidity or unenforceability of any provision of this Revised Plan shall not affect the validity or enforceability of any other provisions of this Revised Plan, which shall remain in full force and effect.

23.   **Ratification.**  For the purposes of ratification, YRC Inc. and USF Holland Inc. shall be treated as one voting unit, and New Penn Motor Express, Inc. shall be treated as a separate voting unit.

24.   **Relationship to Banking Facilities.**  YRCW has entered into a Credit Agreement dated August 17, 2007 (as amended, the "Credit Agreement"), with JP Morgan Chase, National Association, as administrative agent, certain other YRCW subsidiaries, including the Employers, and the other lenders and parties to that agreement. The continued effectiveness of this Revised Plan is entirely dependent upon YRCW entering into an effective amendment to the Credit Agreement that is satisfactory to TNINC.

25.   **Relationship to YRCW Bonds.**  The effectiveness of this Revised Plan is subject to YRCW refinancing or repurchasing or otherwise extinguishing a material portion of its obligations to holders of YRCW's outstanding 5.0% contingent convertible senior notes due 2023 and 5.0% contingent convertible net share settled senior notes due 2023 on or before July 1, 2010 and USF's $8^{1/2}$% Guaranteed Notes due 2010 on or before March 1, 2010 (or, in each case, such later date as the Subcommittee may determine). However, if the required refinancing, repurchasing or extinguishment does not occur and if the Subcommittee does not waive compliance with the condition in this Section 25, then this Revised Plan is terminated, compensation levels will revert to the full NMFA on a prospective basis, any unvested stock options (or stock appreciation rights) issued pursuant to Section 11 shall be cancelled and forfeited and all other provisions of this Revised Plan shall be null and void on a prospective basis, including  Section 4.

26.   **References.**  As used in this Revised Plan, unless the context expressly requires the contrary, references to "Sections" means the sections and subsections of this Revised Plan; references to a "party" mean an Employer or the Union; references to the plural mean the singular, and *vice versa*; references to the masculine include the feminine and neutral, and *vice versa*; and references to an "Exhibit" mean an exhibit to this Revised Plan, which shall become an integral part of this Revised Plan.

27.   **Designated Officer.**  Within 30 days of ratification of this Revised Plan and subject to the approval of the Board of Directors of YRCW (the "Board"), the Employers must exercise best commercial efforts to cause to appoint, subject to the approval of TNFINC and YRCW's bank group, in each case, which approval shall not be unreasonably withheld, a officer with authority to coordinate and oversee YRCW's turnaround (a "Designated Officer") who reports only to the YRCW Chief Executive Officer.  Subject to the approval of the Board, the Designated Officer will have the authority to make changes in the operations of YRCW and its subsidiaries, including personnel and financial decisions.

28.   **Appointment of Additional Director**.  Subject to the approval of the Board, the Employers shall cause YRCW's Board of Directors (the "Board") to take action prior to the Effective Date to cause the number of directors comprising the full Board immediately following the Effective Date to be increased by one person, and cause a person that TNFINC selects and the Board approves (such approval not to be unreasonably withheld) to be appointed as a Board member to hold office from the period commencing one business day after the Effective Time until the shareholders re-elect the person as a director or until his or her successor is duly elected or appointed and qualified, in each case, in the manner provided in the certificate of incorporation and bylaws of YRCW or as applicable law otherwise provides.  During the Non-Permanent Pension Suspension Termination Period, if the person who TNFINC selects resigns, is not elected by the shareholders or is otherwise no longer serving as a director, TNFINC may select a replacement director, subject to the approval of the Board (which approval shall not be unreasonably withheld), and the Board shall appoint the selected person as a director to hold office until the shareholders re-elect the person as a director or until his or her successor is duly elected or appointed and qualified, in each case, in the manner provided in the certificate of incorporation and bylaws of YRCW or as applicable law otherwise provides.  YRCW shall provide the same payments to, and expenses incurred by, the TNFINC selected director as provided to other members of the Board, and such TNFINC selected director shall be subject to those policies and procedures as applicable to the other members of the Board or as may be established by the Board from time to time.

29   **Impact on Prior Plan**.  This Revised Plan shall amend and restate the provisions of the November 25, 2008 Memorandum of Understanding ("Prior Plan") in its entirety on a prospective basis.  If there are any inconsistency between this Revised Plan and the NMFA, this Revised Plan shall govern.

In Witness of the foregoing Revised Plan, the parties hereby acknowledge the Revised Plan as a tentative agreement pending Employer and YRCW  board approval and two-man/membership ratification:

**YRC Inc., USF Holland, Inc., and New Penn Motor Express, Inc.:**

By:   _____

Date:   _____

**Teamsters National Freight Industry Negotiating Committee:**

By:   _____

Date:   _____

# EMPLOYER ABF FREIGHT SYSTEM, INC.

# GRIEVANCE EXHIBIT E

# AGREEMENT FOR THE RESTRUCTURING OF THE YRC WORLDWIDE, INC. OPERATING COMPANIES

# (NMFA AMENDMENT NO. 3)

# AGREEMENT FOR THE RESTRUCTURING

# OF THE YRC WORLDWIDE, INC. OPERATING COMPANIES

YRC Inc., USF Holland, Inc. and New Penn Motor Express, Inc. (each "the Employer") and the Teamsters National Freight Industry Negotiating Committee ("TNFINC") of the International Brotherhood of Teamsters (the "IBT", the "Teamsters" or the "Union") hereby establish this Agreement for the Restructuring of the YRC Worldwide, Inc. Operating Companies (hereinafter "the Restructuring Plan" or "the Plan") for the benefit of all of their employees. This Restructuring Plan has been developed for the express purpose of providing job security for the Employer's Teamster bargaining unit employees by creating the opportunity to engage in a complete financial restructuring of the Employer by reducing both its level of debt and its labor cost; thereby attracting additional investors.  Such restructuring will significantly improve the Employer's ability to compete and provide job security for Teamsters.  This Restructuring Plan is not, and is not intended to be, a plan that the Employee Retirement Income Security Act of 1974, as amended, governs; rather, this Restructuring Plan is an amendment to the NMFA (defined below) that the parties have referred to as the Restructuring Plan.  As used in this Restructuring Plan, "NMFA" means collectively the 2008-2013 National Master Freight Agreement and its applicable supplemental agreements.

    1.  **Employee Participation.**  During the period in which this Restructuring Plan is effective (as set forth in Section 10), each Teamster bargaining unit, full-time employee of the Employer shall participate in the Restructuring Plan. For purposes of the Plan, unless expressly stated to the contrary, the term "employee" means a Teamster bargaining unit employee who is on the seniority list and is scheduled to perform work for the Employer when called, including a probationary employee, a regular employee on lay off status and casuals, and including employees who work on a percentage basis less than 40 hours per week.

    2.  **Financial Restructuring of YRC Worldwide, Inc.**  A Term Sheet/Proposal governing the process for the financial restructuring of YRC Worldwide, Inc., the parent company of the Employer, is attached hereto as Exhibit 1 (the "Term Sheet"). The financial restructuring of YRC Worldwide shall include, among other things, the reduction of the parent company's debt in form and substance satisfactory to TNFINC as the Term Sheet provides; the modifications to the NMFA and its applicable supplemental agreements to create labor cost savings; and the attraction of additional investors to support the recapitalization of YRC Worldwide. TNFINC has specifically advised the Employer of the terms of an agreement which would satisfy the reduction of debt requirement that the Term Sheet provides. To the extent the Term Sheet provides, TNFINC representatives and advisors will be directly involved in the process of restructuring and recapitalizing YRC Worldwide with no final decisions being made on the issues without TNFINC's approval. The involvement of TNFINC in the restructuring process will ensure that the Teamster bargaining unit members' interests are protected and that there is equal sacrifice by the lenders, managers, and nonunion employees and that any transactions with financial investors do not adversely impact Teamster members. When the restructuring process involves the consideration of the lenders converting their debt to equity and/or when new investors are considering investing in YRC Worldwide, Inc., TNFINC reserves the right to determine whether the job security and long-term interest of the members are better served by adjusting the performance triggers, terms and conditions (see Sections 4(c)) for recouping pension and wage relief contained in this Restructuring Plan.

    3.  **Extension of the NMFA and Supplemental Agreements.**  This Restructuring Plan modifies and extends the current NMFA and Supplemental Agreements for a two year period, resulting in an expiration date of March 31, 2015.

    4.  **Re-Entry into the Teamster Pension Funds.**

      (a)  Effective June 1, 2011, the Employer shall commence making contributions to the Teamster Pension Funds covered by the NMFA ("Funds").  In view of the financial condition of the Employer, the pension contribution rate, effective June 1, 2011, shall be at the rate of 25% of the contribution rate in effect on July 1, 2009 when the Non-Permanent Contribution Termination and Deferral went into effect TNFINC and each Employer agree to use their reasonable best efforts and to cooperate to encourage the applicable pension Funds to approve the resumption of participation and contributions as of June 1, 2011. It is understood that pension benefit accrual rates and the other terms and conditions under which the Employer resumes participation shall be determined by each Fund; *provided* that each Fund shall adopt benefit schedules for the Employers that fully fund the normal cost of any new accruals out of the contributions to be made under this Memorandum and provide for a portion of contributions to be contributed to any underfunding of the Fund. It is further understood that the benefit accruals will necessarily be lower than those provided to participants before July 1, 2009.  The Subcommittee created by this Restructuring Plan shall have the authority to address any issues arising out of this Section including (without limitation) the authority to vary the contributions that this Section describes or any of the other terms of the Fund re-entry.  If the Fund has not approved the applicable Employer's resumption of participation in the Fund by June 1, 2011, then each such Fund may elect to either:  (1) apply the amounts due under this Section to the Deferred Amounts due to such Fund for delinquent contributions relating to the period prior to July 1,

2009, or (2) have the amounts due under this Section forwarded to an Escrow Agent satisfactory to the Subcommittee until such time as the Fund approves the terms of the Employer's re-entry. If a Fund does not accept an Employer's participation under the terms and conditions of this Section, the Subcommittee shall have the authority to work with the Fund to alter the terms and conditions of the Employer's re-entry into the Fund, to the extent that the Subcommittee finds it necessary or desirable. Each Fund will have the opportunity to perform financial due diligence with respect to the Employers' ability to make contributions and remain a viable enterprise.

(b)  Consistent with this Restructuring Plan, the Non-Permanent Pension Cessation Period shall end effective May 31, 2011; *provided* the applicable pension Funds shall extend the Non-Permanent Pension Cessation Period until May 31, 2011.

(c)  In determining whether the restructuring is satisfactory to TNFINC in its sole discretion, TNFINC will require a profit sharing provision to provide additional compensation to members based upon the achievement of financial performance triggers by YRCW which requirements have been communicated to YRCW and may be altered by TNFINC in its sole discretion.

5.  **Non-Permanent Pension Contribution Termination and Deferral.**

(a)  As provided by the Amended and Restated Memorandum of Understanding on the Job Security Plan that went into effect on July 1, 2009, the obligation of the Employers to contribute to the Pension Funds ceased effective July 1, 2009 and was to continue through December 31, 2010 ("Non-Permanent Pension Contribution Termination Period"). However, because of the financial circumstances experienced by the Employer, this Restructuring Plan extends the Non-Permanent Pension Contribution Termination Period through May 31, 2011. During the extended Non-Permanent Pension Contribution Termination Period, each Employer may continue its termination of its participation in the Funds (in which it participates; it being understood that such termination shall result in the cessation of any accruals of benefits for the months in the Non-Permanent Pension Contribution Termination Period; it being further understood that the Employers shall not be required to provide contributions to these Funds for the Non-Permanent Pension Contribution Termination Period. At the end of the Non-Permanent Pension Contribution Termination Period on May 31, 2011, each Employer shall resume its participation in those Funds by resuming pension contributions as outlined in Section 4 above, effective June 1, 2011. The parties agree that on this basis, the Employer intends to continue their participation in each Fund. To the extent consent is necessary, TNFINC and each Employer consent to actions by Fund trustees to reduce pension accruals to zero during the Non-Permanent Pension Contribution Termination Period. TNFINC and each Employer agree to use their respective reasonable best efforts to encourage the trustees of each Fund to continue its Non-Permanent Pension Contribution Termination Period Agreement, which shall avoid any debt or accumulated pension obligations of the Employers. The obligation of the Employers to contribute to the Funds shall resume effective June 1, 2011.

(b)  It is hereby acknowledged that the Employer has deferred contributions to Funds and expect to defer such contributions with respect to hours worked until immediately prior to the beginning of the Non-Permanent Pension Contribution Termination Period. To the extent any of those deferrals occurred before or occur after the Effective Date and the respective applicable Funds and Employer enter into deferral agreements, the Employers shall not be in breach of the NMFA (as amended by this Restructuring Plan), and no legal, strike (pursuant to Article 8, Section 3(b) of the NMFA) or other action shall be taken against Employers so long as Employers are not materially in default of the deferral agreements and related documents (as they may be amended from time to time). If an Employer is in material default of a deferral agreement or related document, before any legal, strike or other action is taken against Employer, the Subcommittee (**defined in Section 17**) must provide written notice to the Employer, and the Employer shall have 30 days to cure the default. If the default is cured, any applicable legal, strike or other action shall be rescinded or dismissed, and TNFINC shall use its reasonable best efforts to ensure that any such action is rescinded or dismissed. If prior to the Effective Date, a Fund terminated an Employer, the Employer shall have no obligation to provide contributions to the Fund for the period between such termination and the Effective Date.

6.  **Wage Increases.** This Restructuring Plan provides for hourly rate increases and equivalent mileage rate increase of $0.40 per hour on April 1, 2011, $0.45 per hour on April 1, 2012, $0.40 per hour on April 1, 2013 and $0.40 per hour on April 1, 2014.

7.  **Wage Reduction.** The Employer shall reduce by 15% employees' gross wages or earnings paid per the NMFA, including the increases to wages described above in this Section 6 and the reduced wages in **Section 15**. Such wage reductions and/or reduced earnings shall include overtime and any premium pay, vacation, sick pay, holiday pay, funeral leave, jury duty, and other paid for time not worked. Wage and mileage rate increases outlined in Article 33 of the NMFA, effective April 1, 2011, April 1, 2012, April 1, 2013, and April 1, 2014 shall also be reduced by 15%. This wage reduction will apply to the NMFA bargaining unit as modified by the General Executive Board of the International Brotherhood of Teamsters on November 24, 2009. The cost of living adjustment provisions of Article 33 of the NMFA shall be suspended for the duration of this Restructuring Plan.

8. **Contract Modifications Included in the National Portion of the NMFA.** The following modifications to the 2008-13 NMFA and Supplemental Agreements are to be included as part of the first 39 Articles of the NMFA and cover the entire NMFA bargaining unit, as modified by the General Executive Board of the International Brotherhood of Teamsters in its Resolution of November 24, 2009:

(a) <u>Four Hour Guaranteed Local Cartage Employee</u>: The parties recognize the need for the Employers to create job opportunities and efficient operations during this period of financial restructuring and recession. For these reasons, there is established a four hour guarantee local cartage employee classification. This local cartage classification will enhance the Employers' ability to compete and provide work for the substantial number of laid-off employees. The four hour guaranteed local cartage worker shall have no impact on regular straight time work opportunities of active fulltime employees, unassigned and /or 10%'ers or shapes as defined by the 2008-13 NMFA and Supplemental Agreements.

Work performed by this new classification shall be offered daily first to laid off local cartage workers. The four hour guaranteed local cartage classification shall be paid the applicable straight rate of pay minus the wage reduction (15%). Pension and health & welfare benefits shall be paid consistent with those for regular employees, but laid-off four (4) hour employees shall have contributions paid for hours rather than days worked. In the event that employees in this classification work more than 6 hours, they shall be guaranteed 8 hours. There will be no back-to-back 4 hour shifts or 4 hour overlapping shifts. Laid-off employees may be started within bids at their respective domicile locations.

At each terminal, the number of workers in this four hour guaranteed local cartage classification shall be limited to 10% of the active city seniority roster with a minimum of two (2) positions. It is a violation of this provision for the Employer to lay-off fulltime employees in order to convert them to four hour guaranteed local cartage employees. No regular fulltime active or inactive employee may be forced to work as a four hour guaranteed local cartage worker. The use of the four hour guaranteed local cartage employees will not negatively impact the guarantees of regular fulltime employees. In the event that laid-off employees do not accept four hour work opportunities or no laid-off employees are available, the Supplement shall apply. Replacement of fulltime regular employees or an 8 hour vacancy will be filled in accordance with the Supplement.

(b) <u>Drop & Hooks and Spotting Trailers</u>: At the end of the line terminals/or dark terminals, a road driver that comes into the terminal may drop & hook his/her trailer or trailers and spot trailers to the dock or pull trailers from the dock even though there are local cartage/dock people on duty. This does not apply to the distribution centers or breakbulk terminals.

(c) <u>Sunday thru Saturday Flex Work Week</u>: In all Supplements, the Employer is permitted to have Sunday thru Saturday start times, using the following language:

(a) The work week shall be scheduled for five (5) consecutive days. In addition to and in conjunction with the Monday through Friday work week, the employer shall be entitled to establish bids over the weekend, with the following limitations:

- One (1) to ten (10) employees will equal two (2) bids

- Eleven (11) to twenty (20) will equal three (3) bids

- Twenty-one (21) to forty (40) will equal four (4) bids

- Forty-one (41) or more will equal ten percent (10%) of the roster.

In the event business levels over the weekend increase, additional bids may be added according to the following formula. Use of a premium pay employee for five (5) consecutive weekends will trigger the posting of one (1) additional bid at the discretion of the Employer. This will be applied to pick up and delivery and dock operations at end-of-line locations and pick up and delivery operations at distribution centers and breakbulks.

Weekend bid work shall be paid at the straight time rate. Any vacancy of one week or greater may be offered on a voluntary hold down basis at the straight time rate. All other weekend absences may be filled in accordance with the applicable supplement

(d) <u>Pre-Stringing Trailers</u>:  At end of the line and dark terminals, pre-stringing sets will continue as it is present-ly performed, if equipment and freight are available.  If equipment and freight are not available the road driver will be instructed to hook his/her own set.  In accordance with the Supplement, penalty pay will apply if this is not followed.

(e) <u>Drop & Pick</u>:  Road drivers will be permitted to make one pickup or delivery en-route to his/her destination terminal and he/she is also able to make one pickup or delivery en-route on his/her return trip.  This applies to all road supplemental operations.

(f) <u>Road Casuals</u>:  All Supplemental areas will allow casual road drivers.  In those Supplements which do not cur-rently have road casuals, they shall use the method of 12 tours in 60 days for adding to the seniority board.  If a supplemental area currently has casual road drivers, the current application for adding drivers to the seniori-ty board shall continue to apply.  With respect to boundaries of the Supplemental areas, meet and turns will be permitted.  The meet and turn point will be as equitable as possible for each of the drivers.

(g) <u>Start Times</u>:  Start times in effect today will remain the same.  In addition to the existing start times, the Company will be allowed to add three (3) additional start times in a 24-hour period.  (There shall be no more than 12 total start times unless they currently have them.)

Example: If you currently have 5 start times you would be allowed to have 8 start times.  6 start times could go to 9.  10 start times currently, would go to 12.  These start times include all local cartage, dock, hostler classi-fications.

(h) <u>Lunch Breaks</u>:  Dock employees shall be required to take a 30 minute lunch   break between the fourth (4th) and sixth (6th) hours of his/her shift.  P&D employees shall be entitled to either a 30 minute or 60 minute lunch break, as determined daily at the Employer's discretion, between the fourth (4th) and sixth (6th) hours of his/her shift.

(i) <u>Hostling Across Job Classifications</u>:  When someone bids or is assigned a hostling job, he/she would be required to do any type of hostling required.

Example: Hook road units, city units and trailers to and from dock.

(j) <u>Reduced Break Time</u>:  All locations that currently have two (2) fifteen-minute breaks will be reduced to two (2) ten (10) minute breaks, unless otherwise required by law.  Exceptions are straight 8's and 4-10 hour shifts, which will remain the same.

There will be an additional ten (10) minute break after the tenth (10th) hour and once every two (2) hours there-after.

(k) <u>Vacation</u>:  Reduce vacation by one week for all employees with 4 or more   weeks of vacation, using the cur-rent method for computing vacation pay.

9.  **Equal Sacrifice of Non-Bargaining Unit Employees and their Participation.**

(a)  All non-bargaining unit employees (including management) will participate equally in the Restructuring Plan, and the Employer will share the burden of sacrifices among all IBT bargaining unit and non-bargaining unit employees (includ-ing management), in each case, as described in this **Section 9(a)**.  The Employer must reduce the total compensation (defined as wages plus health and welfare and pension or retirement benefits) of all non-bargaining unit employees (including management) by the same percentage reduction (an "Equal Reduction") in total compensation as is being applied to IBT bargaining unit employees consistent with the Prior Plan.

As of the Effective Date, each Employer will have made permanent the wage reductions originally in the Prior Plan.  During the Non-Permanent Pension Contribution Termination Period, the Employer will be prohibited from making any contributions to Employer provided retirement or pension plans, 401(k) accounts or other retirement vehicles including any defined con-tribution or defined benefit plans for non–bargaining unit employees (including management), to the extent applicable law permits and subject to fiduciary obligations.  The Employer agrees not to increase wages (including bonuses) and benefits of

current non-bargaining unit employees (including management) as an overall percentage beyond the effective overall total compensation percentage increases to be received by the bargaining unit employees. This shall not prevent the Employer from paying variable, performance based compensation as the Employer has paid in past practice. This shall also not prevent the Employer from providing targeted increases to individual employees if necessary, in Employer's judgment, to operate the business so long as the overall total compensation increases are within the effective overall total compensation percentage increases to be received by the bargaining unit employees. If it becomes necessary to exceed this overall percentage increase limit to retain employees for the efficient continued operation of the business, the Employer would request approval from the Subcommittee.

In addition to the nonunion employees' sacrifices mentioned above, the Employer shall have reduced the nonunion employees' headcount and other costs to have created at least $160 million in annualized savings related to this Restructuring Plan.

(b) All remaining non-Teamsters union represented employees of YRC, Reddaway, YRC Glen Moore, and YRC Reimer shall share equal sacrifice in total compensation as those employees covered by NMFA collective bargaining agreements. To that end, it is agreed that immediately upon the Teamster-represented employees of these respective bargaining units voting to accept the conditions in this Restructuring Plan, to achieve such equal sacrifice, the equivalent equal sacrifice reductions shall be imposed on non-Teamster represented union employees of those same operating companies. The Employer and TNFINC shall cooperate in achieving the equal sacrifice among Canadian employees of Reimer, and recognize such efforts must be in compliance with applicable Canadian federal and provincial law.

(c) The Employer and TNFINC agree to use their reasonable best efforts to achieve equal sacrifice in total compensation of the employees covered by non-Teamster and non-NMFA collective bargaining agreements.

10. **Effective Dates; Relation to Collective Bargaining Agreement.** This Restructuring Plan will be mandatory for all employees, since job security is the number one asset the Employer, the Union and the employees all hope to share equally. This Restructuring Plan will be submitted for secret ballot vote of all bargaining unit employees, and shall be put into effect if 50% plus one of the bargaining unit employees voting, vote to adopt the Restructuring Plan. The Restructuring Plan will be effective on the first day of the first payroll period commencing after the date of ratification of the Restructuring Plan (the "Effective Date"). This Restructuring Plan terminates on March 31, 2015. This Restructuring Plan is incorporated by reference into and shall be a part of the NMFA.

11. **Health & Welfare Contributions.**

(a) The increase in Employer contributions to health and welfare shall be (i) on August 1, 2011: $0.35 per hour; (ii) on August 1, 2012: $0.35 per hour; (iii) on August 1, 2013: $0.35 per hour; and (iv) on August 1, 2014: $0.35 per hour. The trigger in all Supplements for qualifying for a week's health and welfare contribution will be three (3) days. Those Supplements on an hourly contribution will continue their respective practices. The contractual provision in the NMFA supplemental agreements authorizing the Supplemental Negotiating Committee to determine the allocation of the health, welfare and pension contribution increases shall be suspended during the Non-Permanent Pension Contribution Termination Period and during the term of this Restructuring Plan. The contribution increases made during the Non-Permanent Pension Contribution Termination Period shall be made only to health and welfare funds.

(b) At the end of the Non-Permanent Pension Contribution Termination Period on May 31, 2011, the Employer will commence contributing the contribution for health, welfare and pension required by the NMFA (as modified by this Restructuring Plan).

12. **Extension of Recall for Laid off Teamsters.** The NMFA is amended to increase the recall rights of laid off bargaining unit employees from five (5) years to ten (10) years. Accordingly, Article 5, Section 1(b) of the NMFA is amended to read: "Seniority shall be broken only by discharge, voluntary quit, retirement, or more than ten (10) –year layoff."

13. **Dispute Settlement.** Unless otherwise provided by the Term Sheet attached hereto, disputes pertaining to this Restructuring Plan are subject to the grievance procedure contained in the NMFA. However, any grievance filed hereunder, by either party, shall be referred initially to the Subcommittee referenced in Section 17 for disposition. If the Subcommittee fails to reach agreement, the matter will be referred to the Chairman of TNFINC and the President of the Employer in accordance with Article 8, Section 2(b)(2) of the NMFA. If the Chairman of TNFINC and the President of the Employer are unable to resolve the matter, the 30 additional days provided in Article 8, Section 2(b)(2) of the NMFA shall be considered as exhausted and the remaining provisions of Article 8, Section 2 shall govern.

14. **Participation.**  An employee begins or continues participation in this Revised Plan on the Effective Date of Restructuring Plan or the first day of the pay period following his/her first day of regular and/or probationary employment.

15. **New Hire.**

(a) **Non-CDL Qualified Employees**

Non-CDL qualified employees (excluding mechanics) hired after the Effective Date begin participation in the Revised Plan on their first day of employment at the following wage progression:

| Time of Service | Maximum Wage Reduction from New Hire Rate Prior to Reduction in Section 3 Above |
|---|---|
| Effective First Day of Employment | Receive 70% of NMFA Wages |
| Effective First Day plus One (1) Year | Receive 75% of NMFA Wages |
| Effective First Day plus Two (2) Years | Receive 80% of NMFA Wages |
| Effective First Day plus Three (3) Years | Receive 100 % of NMFA Wages |

"NMFA Wages" means 100% of the full NMFA rate for the applicable job classification after the agreed upon wage reduction.

(b) **CDL Qualified or Mechanics**

CDL qualified employees and mechanics hired after the Effective Date begin participation in the Restructuring Plan on their first day of employment at the following wage progression:

| Time of Service | Maximum Wage Reduction from New Hire Rate Prior to Reduction in Section 3 Above |
|---|---|
| Effective First Day of Employment | Receive 85% of NMFA Wages |
| Effective First Day plus One (1) Year | Receive 90% of NMFA Wages |
| Effective First Day plus Two (2) Years | Receive 95% of NMFA Wages |
| Effective First Day plus Three (3) Years | Receive 100 % of NMFA Wages |

"NMFA Wages" means 100% of the full NMFA rate for the applicable job classification after the agreed upon wage reduction.

16. **Access to Employer Financial Records.**  The Employer shall submit an annual financial statement in the format of the BTS report to the Subcommittee, and TNFINC reserves the right on an annual basis to examine records of the Employer reasonably required to monitor Employer compliance with this Restructuring Plan or utilize an independent auditor of its choice to do the same.  Notwithstanding any request to the contrary, given applicable privacy laws and policies and for the protection of its bargaining and non-bargaining unit employees alike, the Employer will not share employee specific compensation information with the Subcommittee, TNFINC, the Union or any auditor other than the compensation information that Employer is required to publicly provide pursuant to Securities and Exchange Commission regulation. As a condition of being provided such statements, books and audit, TNFINC and the Subcommittee (and any accountant or auditor engaged on its behalf) must agree to maintain the confidentiality of any Employer financial statements and reports for the protection of the Employer, and to execute a reasonable confidentiality agreement if the Employer requests in such form as the Employer may reasonably require.  The information provided in this Section 16 is supplemented by that provided in the Term Sheet.

17. **Subcommittee to Monitor and Maintain Compliance.**  For purposes of monitoring and maintaining compliance with the terms of this Restructuring Plan (and for prior periods, the Prior Plan), the parties will continue the four person Subcommittee that the Prior Plan established consisting of the Chairman of TNFINC or his designee, the Co-Chairman of TNFINC or his designee, the Employer's President or his designee and another officer of Employer or his designee. The Subcommittee shall meet quarterly or more frequently if necessary, to exchange and discuss pertinent data, including relevant payroll and related information, the reinvestment of capital into the Employer and any and all subjects related to the financial operations of the Employer.  The Subcommittee's decision regarding the interpretation of this Restructuring Plan (and for prior periods, the Prior Plan) shall be final and binding other than provided in the Term Sheet. The Subcommittee may retain financial consultants to assist them in performing their obligations under their Agreement.

18. **Work Preservation.**

(a)  The Employers agree not to establish or buy any new non-union regular route common carrier entity without the prior approval of the Union. The Employer agrees that it will not use any of the savings and other economic benefits derived from this Restructuring Plan or the Prior Plan to provide capital to its parent for the purposes of significantly expanding the domestic and Canadian operations or any operations of the Employer that are not located in the U.S. or Canada. This Section 18 does not apply to the maintenance of existing operations or any existing contractual commitments.

(b)  The Employer agrees that it will not transfer any bargaining unit work to India or any other country and will return any payroll work performed by the bargaining unit beginning upon ratification and shall be concluded within four (4) months thereafter. The Subcommittee will review the Employer's compliance with this paragraph during the first quarter.

19. **Termination.**  If this Restructuring Plan is not ratified by those employees of Employers that are covered by the NMFA by November 1, 2010, or if Funds representing 90% of the Employers' collective monthly contributions to the Funds have not approved the applicable Employer's resumption of participation to the Fund by June 1, 2011, each Employer may terminate this Plan. Each Employer agrees not to terminate the Restructuring Plan before November 1, 2010 without approval of the Union. However, if prior to November 1, 2010, the Restructuring Plan is terminated with approval of the Union, wage levels will revert or snap back to the full NMFA.

20. **Bankruptcy Protection.**  The purpose of this Restructuring Plan is to make a financial accommodation for the benefit of the Employer, within the meaning of section 365(e)(2) of the Bankruptcy Code.  Accordingly, if the Employer files a Chapter 7 or 11 bankruptcy petition or is placed in an involuntary bankruptcy proceeding, this Restructuring Plan may be terminated and wages reverted to full NMFA on a prospective basis, if the Union so elects in writing.  If the Union does not exercise its option hereunder, the Employer agrees not to file any motion under Sections 1113 or 1114 of the Bankruptcy Code without TNFINC approval.

21. **Type of Agreement.**  This Restructuring Plan shall be applicable to the NMFA and its supplements that have been agreed to by the Employer and TNFINC.

22. **Card Check and Neutrality.**  As to any non-union common carrier freight entity that the Employer, its parent or holding company or subsidiaries of the Employer buys, establishes or maintains, the parties to this Restructuring Plan agree that, as soon as a Teamster Local Union shows the entity authorization cards signed by the majority of employees in the bargaining unit, the Local Union will be recognized as the exclusive bargaining representative for those employees. The Employer or its affiliated companies will remain neutral if the Local Union seeks to represent unrepresented employees for this new entity. Neutrality means that the new entity will not make statements or take other actions opposing or advocating unionization. The new entity shall not demean the Union as an organization or its representatives as individuals. The new entity will inform all managerial employees and supervisors of their obligation under this neutrality agreement and will take prompt action to correct any violation of this Section 22.  Disputes regarding the application of this Section 22 shall be resolved on an expedited basis by the Subcommittee.

23. **Leave of Absence.**  During the Non-Permanent Pension Contribution Termination Period, bargaining unit employees who are participating in this Restructuring Plan will be permitted to start a leave of absence without pay to work for another Teamster employer until December 31, 2010.  All leaves of absence under this Section shall terminate with the cessation of the Non-Permanent Pension Contribution Termination Period on June 1, 2011.

24. **Current Ownership.**  If a Change of Control of YRC Worldwide Inc., including all domestic or Canadian subsidiaries but excluding Chinese businesses (collectively "YRCW") occurs, this Restructuring Plan may be terminated and wages reverted to full NMFA on a prospective basis if the Union so elects in writing and all other provisions of this Revised Plan shall be null and void on a prospective basis; *provided* that in the case of the sale of a business unit of YRCW, whether through the sale of assets or stock or through a merger, the election shall only apply to the business unit that is the subject of the sale.  Union approval for any Change of Control is required. For the purposes of this <u>**Section 24,**</u> a "Change of Control," shall be deemed to have taken place if a third person, including a "group" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended,

(a)  purchases or otherwise acquires shares of YRCW after the date of this Agreement that, together with stock held by such person or group, constitutes more than 50 percent of the total voting power of the stock of YRCW where the current directors of YRCW (or directors that they nominate or their nominees nominate) no longer continue to hold more than 50% of the voting power of the board of directors);

- 7 -

(b) acquires a material portion of the assets of a business unit of YRCW that is subject to a Union collective bargaining agreement.

25.     **Severability.**  The invalidity or unenforceability of any provision of this Restructuring Plan shall not affect the validity or enforceability of any other provisions of this Restructuring Plan, which shall remain in full force and effect.
]

26.     **Ratification.**  For the purposes of ratification, YRC Inc. and USF Holland Inc. shall be treated as one voting unit and New Penn Motor Express, Inc. shall be treated as a separate voting unit.

27.  **References.**  As used in this Restructuring Plan, unless the context expressly requires the contrary, references to "Sections" means the sections and subsections of this Restructuring Plan; references to a "party" mean an Employer or the Union; references to the plural mean the singular, and *vice versa*; references to the masculine include the feminine and neutral, and *vice versa*; and references to an "Exhibit" mean an exhibit to this Restructuring Plan, which shall become an integral part of this Restructuring Plan.

28.  **Impact on Prior Plan.**  This Restructuring Plan shall amend and restate the provisions of the July 9, 2009 Memorandum of Understanding ("Prior Plan") in its entirety on a prospective basis.  If there are any inconsistencies between this Restructuring Plan and the NMFA, this Restructuring Plan shall govern.

In Witness of the foregoing Restructuring Plan, the parties hereby acknowledge the Restructuring Plan:

**YRC Inc., USF Holland, Inc., and New Penn Motor Express, Inc.:**

By:   _____

Date:   _____

**Teamsters National Freight Industry Negotiating Committee:**

By:   _____

Date:   _____

# Term Sheet/Proposal

In connection with, and as a condition to, concessions to YRC Worldwide Inc., including all subsidiaries and affiliates, (the "Company") being considered by the Teamsters National Freight Industry Negotiating Committee ("TNFINC") of the International Brotherhood of Teamsters (the "IBT"), TNFINC hereby submits this Term Sheet/Proposal summarizing the key terms and conditions of any such concessions.  All terms from prior TNFINC agreements with the Company shall remain in effect unless specifically modified by the terms set forth below.  This Term Sheet/Proposal is binding on the parties hereto and is subject to required approvals of the IBT, TNFINC and IBT member ratification as well as approval of the Company's Board of Directors.

| | |
|---|---|
| Description of Transaction: | TNFINC would be willing to agree to the Concessions described in the MOU (defined below) subject to the  conditions specified in this term sheet for a term expiring on March 31, 2015. |
| Concessions: | The concessions are set forth in the Agreement for the Restructuring of the YRC Worldwide Inc. Operating Companies ("MOU") to which this Term Sheet/Proposal is attached.  In determining whether the restructuring with the lenders and the Capital Event is satisfactory to TNFINC in its sole discretion, TNFINC will require a profit sharing provision to provide additional compensation to members based upon the achievement of financial performance triggers by  the Company which requirements have been communicated to the Company and may be altered by TNFINC in its sole discretion, including adjustments to incorporate cash flow recapture and other mandatory repayment provisions or commitment reductions under the Company's Revolving Credit and Term Loan Facilities. |
| | Subject to the provisions of this term sheet, including without limitation, the matters set forth under the caption Timing below, the concessions set forth in the MOU could become effective promptly after IBT and TNFINC shall have obtained all required approvals and ratifications to the effectiveness of such concessions as described above.  In the event such approvals and ratifications are obtained, such concessions could be implemented in October 2010.  The parties acknowledge that the provisions of this Term Sheet/Proposal are also subject to the approval of the Company's Board of Directors.  In the event the approval of the Company's Board is not obtained on or before September 29, 2010, this Term Sheet/Proposal shall be null and void without any further action of any party hereto. |
| ABS Credit Facility: | The Company would enter into an amendment with the lenders under the ABS Credit Facility renewing or extending its ABS facility in an amount of at least $300 million in capacity (or such other amount as TNFINC may agree in its sole discretion). TNFINC would be provided with copies of the proposed amendment to provide its input to the Company regarding the proposed terms. |
| Revolving Credit and Term Loan Facilities: | The Company would enter into an agreement with the lenders under the revolving credit and term loan facilities pursuant to which the Company's debt would be restructured, in form and substance satisfactory to TNFINC, in its sole discretion, which shall reduce the Company's outstanding indebtedness |

| | |
|---|---|
| | to an amount satisfactory to TNFINC, in its sole discretion.  TNFINC has advised the Company of the terms of an agreement that would satisfy this requirement. |
| Equity Ownership of the Company: | TNFINC has advised the Company of the pro forma equity ownership of the Company after giving effect to the concessions, restructuring and transactions described in this term sheet which would satisfy TNFINC in its sole discretion, other than the capital transaction described under the caption Capital Event.  The parties acknowledge that the equity ownership of the Company will be materially changed as a result of a Capital Event.

TNFINC would have full discretion to select the vehicle(s) that would hold any interests granted to IBT for the benefit of the employees it represents. |
| Non-Union Pension Funding Obligations: | To the extent applicable law permits and subject to fiduciary obligations, the Company will reduce or defer contributions to the Company's single employer pension plans. |
| Capital Raising Updates; Reports: | The Company will advise TNFINC of possible transactions and update TNFINC on a regular basis (at least weekly) as to all steps taken to effectuate the restructuring and recapitalization of the Company. |
| | In the event that the Company engages in a process to enter into any material transaction pursuant to which it may dispose of any material portion of its assets or business to a third party, enter into any material debt or equity capital transaction (including the restructuring contemplated hereby), the Company would:

- provide TNFINC proposed transaction terms and analyses and other documentation to evaluate, review and comment

- provide TNFINC with the business plans and financial models that support the analysis for the restructuring and recapitalization of the Company

- provide TNFINC with reasonable access to senior management of the Company and its advisors, Alvarez & Marsal and Rothschild to discuss and analyze possible transactions

- provide TNFINC with reasonable access at appropriate times to designated members of the Company's board of directors to discuss and analyze possible transactions

- introduce TNFINC to parties that the Company believes have proposed viable restructuring and recapitalization solutions for the Company |

|  | |
|---|---|
| | <ul><li>provide the Subcommittee and TNFINC information required under the credit agreement or otherwise provided to the lenders and with all information reasonably requested by TNFINC relating to the Company as soon as reasonably practicable after the request therefor</li><li>share with TNFINC proposals from third party financing sources as well as copies of any indications of interest or proposals from or responses to capital raising sources (all such items with regard to the restructuring shall be delivered promptly after the presentation of this Term Sheet) as well as copies of all proposals and other communications regarding the restructuring with the lenders</li><li>consult with TNFINC throughout the process, including, without limitation, with respect to any bidding procedures, introducing TNFINC to all parties that the Company believes are likely to be viable bidders in such sale process no later than a reasonable time period after the first indications of interest are received but at least concurrently with any other significant communications between the Company or its agents and such third parties and</li><li>to the extent legally permissible, provide, at the Company's reasonable cost and reasonable expense, for TNFINC to be advised by a financial advisor or investment banking firm selected by TNFINC</li></ul>To facilitate the foregoing the Company will request amendments or waivers to any existing confidentiality agreements to permit the sharing of information contemplated hereby and will not enter into any confidentiality agreement that in any way restricts any such sharing of information. |
| Capital Event: | As a condition to the continued effectiveness of the concessions contemplated by this term sheet, (i) on or prior to December 31, 2010 (or such later date as TNFINC may agree in its sole discretion) the Company would have entered into definitive documentation with respect to, and (ii) on or before March 31, 2011 (or such later date as TNFINC may agree in its sole discretion) the Company would have consummated a capital transaction that results in, an additional equity investment in the Company of at least $300 million or such other amount as shall be acceptable to TNFINC based upon an opinion from a financial adviser satisfactory to TNFINC addressed to the Company and which may be relied upon by TNFINC.<br><br>Notwithstanding the foregoing or the matters set forth under the caption Revolving Credit and Term Loan Facilities, if the Company can demonstrate financial sustainability, including adequate liquidity on a pro forma basis post transaction, TNFINC may in its sole discretion deem the requirements set forth under this caption and the caption Revolving Credit and Term Loan Facilities to have been met. |

| | |
|---|---|
| Restricted Payments: | Any covenant regarding Restricted Payments agreed to by the Company with the lenders under the Revolving Credit and Term Loan Facilities in connection with the restructuring and recapitalization of the Company shall be incorporated in this Term Sheet as if fully set forth herein. |
| Indemnity: | To the maximum extent legally permissible, the Company would indemnify on reasonable terms and conditions TNFINC and its controlling persons, directors, officers, partners, affiliates, agents, representatives, advisors (legal and financial) and employees from and against all liabilities, losses, claims damages, actions, proceedings, investigations or threats thereof, including without limitation, all costs and expenses (including legal fees and expenses) incurred in connection with the defense thereof arising out of or relating to the execution, delivery or performance of this term sheet and the transactions contemplated hereby. |
| Board Composition and Representation: | In the event that TNFINC in its sole discretion approves a restructuring or recapitalization of the Company that has been consummated, TNFINC shall be entitled to designate a minimum of two (2) members to the Board of Directors of the Company.<br><br>TNFINC has advised the Company of certain additional governance provisions which would satisfy TNFINC in its sole discretion. |
| Stockholder Rights/ Registration Rights: | The vehicle(s) designated by TNFINC to hold any equity interests would be provided tag along rights in connection with any sale of capital stock of the Company by any lender or other specified stockholders of the Company. Such vehicles would have demand and "piggyback" registration rights no less favorable to them than the rights granted to any other stockholder of the Company. |
| Sale/leaseback and Senior Convertible Notes: | The Company will review their existing sale/leaseback transactions and the Company's senior convertible notes (which the Company has guaranteed) to determine if opportunities exist to improve the terms of those transactions and notes or achieve a favorable impact to the Company and will consult with TNFINC and its advisors regarding these transactions and notes. |
| Remedies: | Without limiting any other remedy available at law or equity, the definitive agreements would provide for specific performance remedies for all breaches by the Company or any other party thereto for which legal damages would be an inadequate remedy. |
| Subcommittee/ Fees and Expenses: | For purposes of monitoring and maintaining compliance with the terms of the MOU (and for prior periods, the Amended and Restated Memorandum of Understanding on the Job Security Plan dated July 7, 2009 (the "Prior Plan")), the parties will continue the four person Subcommittee that Section 17 of the MOU confirms. The Subcommittee's decisions regarding the interpretation of |

67751 YRC Term  9/27/10  4:03 PM  Page 5

<table>
<tr>
<td></td>
<td>the MOU (and for prior periods, the Restated Job Security Plan) and this Term Sheet/Proposal shall be final and binding.

If an applicable multiemployer pension fund (each a "Fund") fails to accept a Company's participation in the Fund under the terms and conditions outlined in the MOU, the Subcommittee shall have the authority to work with the Fund to alter the terms and conditions of the Company's re-entry into the Fund to the extent that the Subcommittee finds it necessary or desirable.

The parties understand and agree that in connection with TNFINC's participation and involvement in the negotiation of additional adjustments to the Company's obligations under the NMFA and in the restructuring and recapitalization of the Company, the parties have been and will be consulting with financial and legal advisors retained by the Subcommittee. To the maximum extent legally permissible, the Company agrees that it will pay and/or reimburse all reasonable fees, costs and expenses of such financial and legal advisors.</td>
</tr>
<tr>
<td>Timing:</td>
<td>In the event (a) the Company does not consummate the restructuring contemplated by this Term Sheet with its lenders in form and on terms satisfactory to TNFINC in its sole discretion or (b) the Company does not enter into definitive agreements contemplated by clause (i) of Capital Event on terms satisfactory to TNFINC in its sole discretion, in each case on or before December 31, 2010 (or such later date as TNFINC may agree in its sole discretion), or (c) the Company does not consummate the Capital Event on or before March 31, 2011 (or such later date as TNFINC may agree in its sole discretion), on terms and conditions satisfactory to TNFINC in its sole discretion, or (d) the Company does not comply with any of its other agreements set forth in this Term Sheet , or (e) the various transactions contemplated by this Term Sheet become, in the sole judgment of TNFINC, unlikely to be consummated for any reason, including by virtue of actions taken by any of the Company's lenders, then upon notice to the Company from TNFINC the concessions contemplated hereby shall become null and void and the Company shall owe TNFINC, on behalf of and for the benefit of IBT members, an amount equal to the concessions that had in fact benefitted the Company.

Notwithstanding any other provisions of this Term Sheet/Proposal or the MOU to the contrary, if prior to the filing of a petition in bankruptcy with respect to the Company or any of its subsidiaries, including the Employers, TNFINC exercises its rights to nullify the concessions, to the extent the exercise of those rights and the voiding of those concessions would constitute a Deferral Termination Event under the Company's Credit Agreement, the concessions shall revert to the rates in the Prior Plan and TNFINC shall have the rights in the Prior Plan.

In determining whether the restructuring with the lenders and the Capital Event is satisfactory to TNFINC in its sole discretion, the factors TNFINC</td>
</tr>
</table>

would consider shall include without limitation the terms of the restructuring and the total amount of indebtedness that remains outstanding after giving effect to the restructuring, the entity making the investment or acquisition pursuant to the Capital Event, the amount and form of equity participation or other consideration given for the value of the concessions, the changes in the Company's capital structure and senior management effected in the transaction, corporate governance and the financial viability of the Company on a going forward basis specifically including but not limited to the amount of leverage the Company will have on a pro forma post transaction basis.

The concessions that are provided in the MOU will continue to be available to a new investor providing the capital contemplated under Capital Event if the Capital Event is consummated on or before March 31, 2011 so long as the Company entered into definitive documentation with respect to the Capital Event on or before December 31, 2010 or in each case such later date as TNFINC shall decide in its sole discretion.

**YRC Inc., USF Holland, Inc. and New Penn Motor Express, Inc.:**

By: _____

Date: _____

**Teamsters National Freight Industry Negotiating Committee:**
By: _____

Date: _____